**EURECAT US, INC., Appellant**

v.

**Soren MARKLUND, Douglas Wene, and Chem 32, LLC, Appellees**

**NO. 14-15-00418-CV**

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed May 31, 2017

---

1. *See* TEX. PENAL CODE ANN. § 49.04(a)–(b) (Vernon Supp. 2016).

See also 425 S.W.3d 577.

Matthew L. Hoeg, Houston, TX, for Appellant.

Nicholas Stepp, Benjamin A. Escobar Jr., Michael Dwayne Seale, N. Terry Adams, Jr., Houston, TX, for Appellees.

Panel consists of Justices Busby, Donovan, and Wise.

## OPINION

J. Brett Busby, Justice

Appellees Soren Marklund and Douglas Wene started a business, Chem 32, LLC, in competition with their former employer, appellant Eurecat U.S., Inc. Eurecat sued all three appellees, seeking injunctive relief as well as monetary damages. After a lengthy trial, the jury found in favor of appellees on all of Eurecat's claims except its breach of contract action against Wene. The parties submitted their claims for attorneys' fees to the trial court. The trial court signed a final judgment awarding Eurecat: (1) $15,200 damages for Wene's breach of contract, (2) $15,000 in attorneys' fees, and (3) prejudgment and post-judgment interest. The final judgment also awarded appellees, as the prevailing parties on Eurecat's claim under the Texas Theft Liability Act, $600,000 in attorneys' fees.

Eurecat appeals from the trial court's judgment, raising ten issues. We first revisit the trial court's protective order preventing broad third-party discovery by Eurecat and conclude that it was within the trial court's discretion given evidence that Eurecat breached the parties' confidentiality agreement and sought to use the discovery process and contacts with third parties to harm Chem32 as a competitor. As to Eurecat's claims of breach of fiduciary duty, we hold that the evidence did not support Eurecat's requested instructions and that sufficient evidence supports the jury's failure to find a breach. We also conclude that the trial court properly directed a verdict against many of Eurecat's claims for breach of confidentiality agreements because it failed to show that one agreement was made and that others were supported by consideration. Finally, we hold that under the charge as given, sufficient evidence supports the jury's failure to find that another confidentiality agreement was breached. We therefore affirm the judgment.

### BACKGROUND

#### A. Eurecat hires Marklund and Wene.

Eurecat is a subsidiary of Eurecat, S.A., a French company. Eurecat operates in the specialized field of off-site catalyst activation in North and South America.[1] Beginning in 1996, Marklund served as the president of Eurecat, though he was employed by another company.[2] Marklund became a Eurecat employee in 2005 and signed an employment contract—styled "Letter Agreement"—at that time. Marklund's job as president was to "direct the business of the company, to hire people, manage all different kind of legal affairs, and to do the best to promote the growth and the future of the company." The Letter Agreement provided that Marklund was an at-will employee. The Letter Agreement did not contain a non-compete clause. Eurecat contends that Marklund also signed two Patent and Trade Secret Agreements, but those agreements are not in our record.

Wene began working for Eurecat in 1999 as the company's production manager. Wene's title changed soon afterward to plant manager. Wene explained that the changed title more accurately reflected his actual responsibilities at Eurecat's manufacturing plant. Wene reported directly to Marklund. Like Marklund, Wene was an at-will employee who did not sign a covenant not to compete.

Wene did sign a Patent and Trade Secret Agreement when he began work in 1999. Wene promised in that agreement that he would "use his best efforts and utmost diligence to guard and protect [Eurecat's] trade secrets and confidential information." Wene also agreed that during or after his employment with Eurecat he would not "use for himself or others, or divulge to others any of [Eurecat's] trade secrets or confidential information which he may develop, obtain or learn about during or as a result of his employment by

---

1. Catalyst is a material used to start the process of converting crude oil into refined petroleum products. Most catalyst is activated on-site, that is, at the refinery or chemical plant. The chemical details of catalyst activation and the specifics of how it is used in the petroleum refining process are beyond the scope of this appeal.

2. Marklund's original employer was Akzo Nobel, a Dutch multinational company that partially owned Eurecat. Akzo Nobel loaned Marklund to Eurecat where he served as president of the company. Akzo Nobel continued to pay Marklund and Eurecat reimbursed Akzo Nobel. Marklund retired from Akzo Nobel in 2005 and became a Eurecat employee on November 1, 2005.

[Eurecat]...." Wene also agreed that, upon the termination of his employment, he would not take with him, and would leave with Eurecat, all records, papers, and "all matter of whatever nature which contain [Eurecat] trade secrets or confidential information." The agreement defined both trade secrets and confidential information as

> any information received from and concerning the affairs of EURECAT U[.]S. or AFFILIATED COMPANIES, such as products, methods, compilations, lists of customers, pricing procedures, or other information of whatever nature which gives to EURECAT U.S. or AFFILIATED COMPANIES an opportunity to obtain an advantage over competitors who do not know it or use it, but it is understood that said terms do not include knowledge, skills, or information which is common to the trade or profession of EMPLOYEE.

Wene also signed a second Patent and Trade Secret Agreement in 2011.

Eurecat was a troubled company when Marklund took control in 1996. Once Wene was hired, Marklund and Wene were the top Eurecat employees in the United States, and they worked together closely.[3] Eurecat and Eurecat, S.A. worked out a process for off-site catalyst activation, and Eurecat prospered under Marklund and Wene's leadership. Eurecat did not obtain patents for its off-site catalyst activation process, opting instead to protect the process as a trade secret.[4]

**B. Marklund and Wene plan to compete with Eurecat and later leave to form Chem32.**

In the spring of 2009, Francis Valeri, the chairman of the board for both Eurecat and Eurecat, S.A., attended a meeting at Eurecat's main office in Clear Lake. Valeri told Marklund and the other managers that he was planning to restructure Eurecat. In that reorganization, Marklund's position as president would be eliminated and replaced with two vice presidents, one in charge of production and the other in charge of marketing and sales. Valeri told Marklund he would receive another, unspecified, role within the Eurecat, S.A. family of companies. Marklund was unhappy with the plan and, believing he no longer had a future at Eurecat, he told Valeri he would have to start looking out for his own interest and making his own plans.

Frederic Jardin was transferred from Eurecat, S.A. to Eurecat soon thereafter, ostensibly for a one-year period to learn sales and marketing in the United States. Jardin became Eurecat's vice president for sales and marketing. Prior to Jardin's 2010 arrival, Marklund had devoted about sixty percent of his time to sales and marketing activities. Feeling underutilized, Marklund testified that he began thinking about other options and thought that the time might have arrived to make a change.

According to Marklund, sometime during the summer of 2010, he encountered Wene in the Eurecat parking lot. Marklund told Wene, his best friend at Eurecat, that Marklund was uncertain about his future at Eurecat and he needed to start looking for something else to do. Wene asked Marklund to consider starting a company with him to compete against Eurecat. Marklund said he was willing to investigate the possibility, as long as they did nothing that compromised their agreements with Eurecat.

---

**3.** According to Marklund, he met with Wene at least twice a week.

**4.** The record includes evidence that all intellectual property associated with Eurecat's business is owned by Eurecat, S.A.

Marklund and Wene began developing a business plan for the new business. They also began searching for a plant location. Marklund and Wene believed they could use a different method to activate catalyst from the one used by Eurecat.[5] They also planned to sell their service to catalyst manufacturers rather than directly to refineries. It is undisputed that Marklund and Wene never revealed their plans to open a competing business to Eurecat or Eurecat, S.A.

Marklund traveled to Europe on Eurecat business in September 2010. Part of that business included a meeting with Niels Sorenson, the head of Haldor Topsoe, a catalyst manufacturer and Eurecat customer. Sorenson also happened to be a longtime friend of Marklund's. During the meeting, Marklund testified that he asked Sorenson's opinion on the wisdom of joining Wene in starting a business that would compete with Eurecat. Sorenson told Marklund he did not think it would be a good idea. Sorenson's warning did not dissuade Marklund from continuing to evaluate the possibility of starting a competing business.

Marklund had another Haldor Topsoe meeting in November 2010, while he was in Europe to attend a Eurecat board meeting. Marklund met with Bradley Cooper, Haldor Topsoe's technical manager for catalyst activation, to discuss both Eurecat business and the idea of starting a new company. Marklund testified that he discussed the potential of the new company

doing business with Haldor Topsoe, particularly if it could obtain a higher yield percentage in the production of activated catalyst. Marklund also broached the possibility of Haldor Topsoe providing a letter of intent about potential future business with the proposed entity that could be used in his efforts to obtain financing. Cooper's response was noncommittal on both subjects. At the time of Marklund's 2010 Haldor Topsoe meetings, a new business entity had not yet been formed, nor had a factory site been obtained. Marklund testified that he and Wene were not yet certain they were going forward with the plan.

Marklund and Wene's planning and preparations continued while they were still employed by Eurecat. They formed Chem32, LLC in February 2011. Marklund met with Sorenson a second time in the spring of 2011, and he again brought up the idea of a letter of intent from Haldor Topsoe. Sorenson agreed to provide a letter, which was ultimately signed on June 17, 2011.[6] On May 31, Marklund notified Valeri of his intent to resign from Eurecat, effective at the end of July.

Wene found an abandoned factory site in Orange, Texas in May 2011. Wene and Marklund spent the spring and summer of 2011 investigating whether it would be a suitable site for their new business. The investigation included an environmental study conducted in August 2011. According to Marklund, financing for the purchase of the Orange site, as well as Wene's willing-

---

**5.** Eurecat uses a moving-bed reactor to activate catalyst, which enables large quantities of activated catalyst to be produced. Marklund and Wene planned to use a fixed-bed reactor, which produces smaller amounts of activated catalyst. They believed this method would be attractive to a small segment of the market.

**6.** Although Sorenson states in the letter that Haldor Topsoe "will welcome the opportunity

to use the services of Chem32," he concludes "our use of the services from Chem32 will of course have to be preceded by carefully conducted trials and approvals by Haldor Topsoe A/S as well as competitive pricing." Marklund testified that, due to the lack of an actual commitment to purchase Chem32 product, the letter was not used in Chem32's loan applications.

ness to resign from Eurecat, depended on the result of the August environmental study. The bank approved the loan and Chem32 closed on the Orange site on September 9, 2011. Wene gave notice that he was resigning from Eurecat the same day.

After the closing, Marklund and Wene moved a trailer onto the site and began working to get the plant up and running. This process took several months, as they had to build and install the plant equipment, commission the plant, and then produce catalyst samples to be evaluated by their potential customers. They began contacting potential customers in the fall of 2011. According to Marklund, Chem32 was finally ready to offer services to customers in June 2012. Chem32's first sales were in the summer of 2012. It is undisputed that Chem32 competes directly with Eurecat by offering similar catalyst activation services.

### C. Eurecat sues Marklund, Wene, and Chem32.

Eurecat filed this suit in May 2012. Eurecat alleged numerous causes of action against Marklund, Wene, and Chem32, including breach of fiduciary duty, breach of contract, and misappropriation of trade secrets. Eurecat later added a cause of action for violation of the Texas Theft Liability Act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 134.001 *et seq.* (West 2011). Eurecat also sought temporary and permanent injunctions. Appellees answered and filed a counterclaim alleging that Eurecat (1) engaged in business disparagement, (2) committed tortious interference, and (3) was a monopolist under the Texas Free Enterprise and Antitrust Act.

Soon after Eurecat filed suit, the trial court signed an order restraining appellees from (1) using or disclosing misappropriated Eurecat computer software; (2) using or disclosing information or documents about Eurecat's activation process obtained during their employment; and (3) intentionally deleting or destroying files or documents that belonged to Eurecat or contained Eurecat confidential or proprietary information. The order also required appellees to allow a forensic computer expert to inspect all computers used by appellees.[7]

Several months later, the trial court signed an agreed temporary injunction enjoining appellees from using or disclosing "any files, property, software, firmware, documents or other equipment that belongs to Eurecat, that were obtained or created in connection with Eurecat's business, or that contain Eurecat's confidential and proprietary information." The injunction did not prohibit appellees from competing with Eurecat, so long as appellees did so "without using any files, property, software, firmware, documents or equipment belonging to Eurecat, that were obtained or created in connection with Eurecat's business, or that contain Eurecat's confidential and proprietary information."

The discovery process was riven by disputes shortly after it began. The trial court granted appellees' request for a protective order preventing Eurecat from serving certain third-party discovery. Eurecat challenged this order by filing two petitions for writ of mandamus in this Court, both of which we denied. *See In re Eurecat US, Inc.*, No. 14-14-365-CV, 2014 WL 2547595 (Tex. App.—Houston [14th Dist.] June 5, 2014, orig. proceeding) (per curiam); *In re Eurecat US, Inc.*, 425 S.W.3d

---

7. Appellees allowed the inspection. Appellees also turned over all disputed computers to Eurecat or its representatives. Appellees eventually allowed Eurecat to send its designated computer expert back to their plant site to delete from Chem32's computers anything the expert deemed connected with Eurecat.

577 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding).

Eurecat moved for summary judgment on appellees' counterclaim alleging that Eurecat violated the Texas Free Enterprise and Antitrust Act. The trial court granted the motion, and appellees have not appealed that ruling.

The remaining claims proceeded to trial, which lasted more than a month. The trial court granted appellees' motion for directed verdict on Eurecat's breach of contract claims based on breaches of the Patent & Trade Secret Agreement that Wene signed in 2011 and that Eurecat contends Marklund signed in 1999 and 2011.

At the conclusion of the evidence, the trial court submitted Eurecat's remaining claims to the jury in a forty-page charge. The jury found that: (1) Marklund and Wene did not breach their fiduciary duties to Eurecat; (2) Marklund did not breach the 2005 Letter Agreement; (3) Wene did breach his 1999 Patent and Trade Secret Agreement; (4) Eurecat's damages caused by Wene's breach were $15,200; (5) Eurecat did not have any trade secrets or statutory trade secrets (a predicate question for Eurecat's claim under the Texas Theft Liability Act);[8] (6) appellees did not misappropriate Eurecat property; and (7) Eurecat did not own a protectable trademark in the phrase "Load and Go."

The parties submitted their requests for attorneys' fees to the trial court. The court signed a final judgment awarding Eurecat: (1) $15,200 damages for Wene's breach of the 1999 Patent and Trade Secret Agreement; (2) $15,000 in attorneys' fees; and (3) prejudgment and post-judgment interest. The final judgment also awarded appellees, as the prevailing parties on Eurecat's Texas Theft Liability Act claim, $600,000 in attorneys' fees. This appeal followed.[9]

## ANALYSIS

### I. The trial court did not abuse its discretion by issuing the protective order.

Eurecat argues in its first two issues that the trial court abused its discretion when it granted appellees' request for a protective order prohibiting Eurecat from serving third-party discovery on eighty-nine companies. Appellees respond that the trial court properly exercised its discretion in weighing the evidence before it, including the risk that Eurecat's proposed third-party discovery would harm Chem32's business.

### A. Standard of review and applicable law

■ We review a trial court's protective order for an abuse of discretion. *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 661 (Tex. 2009). A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Id.*

■ The purpose of discovery is to narrow the focus of the trial process. *In re Allstate Cnty. Mut. Ins. Co.*, 227 S.W.3d 667, 668 (Tex. 2007). Courts expect discovery requests to be "reasonably tailored" and will not permit fishing expeditions. *Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 815 (Tex. 1995). The scope of discovery is largely within the discretion of the trial court. *Dillard Dept. Stores, Inc. v. Hall*, 909 S.W.2d 491, 492 (Tex. 1995). Courts recognize the need to give parties some

---

8. Because the jury determined Eurecat did not have any statutory trade secrets, it did not answer the question whether appellees committed civil theft of a statutory trade secret.

9. Eurecat has not challenged the jury's findings that Eurecat did not have any trade secrets or statutory trade secrets, nor the trial court's award of attorneys' fees to appellees.

latitude in discovery requests, taking into consideration the circumstances and the nature of the case. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998); *Texaco, Inc.*, 898 S.W.2d at 815.

■ . Parties are encouraged to work out discovery disputes among themselves without court intervention. *McKinney v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 772 S.W.2d 72, 75 (Tex. 1989); *see* Tex. R. Civ. P. 191.2. When disputes cannot be resolved, courts may issue a protective order preventing or limiting discovery to protect an affected person from "undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights." Tex. R. Civ. P. 192.6; *see also In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 707–08 (Tex. 2015).

■ The trial court has broad discretion in granting a protective order. *In re Eurecat US, Inc.*, 425 S.W.3d at 582. To justify a protective order, a party seeking to avoid discovery must produce sufficient facts to show particular, specific, and demonstrable injury. *Brewer & Pritchard, P.C. v. Johnson*, 167 S.W.3d 460, 466 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).[10] To decide whether a protective order is appropriate, a trial court balances the parties' competing interests. *See Garcia v. Peeples*, 734 S.W.2d 343, 348 (Tex.

1987) (holding trial court should have balanced parties' competing needs before granting protective order). The trial court's balancing test is codified in Texas Rule of Civil Procedure 192.4(b). Under that rule, discovery "should be limited" if the court determines that "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Tex. R. Civ. P. 192.4(b). The court may also consider harm that the resisting party might suffer as a result of the discovery. *See* Tex. R. Civ. P. 192.6(b) (authorizing court to protect movant from consequences of requested discovery including harassment or invasion of property rights); *In re Weekley Homes, L.P.*, 295 S.W.3d 309, 322-23 (Tex. 2009) (noting harm party resisting discovery might suffer as result of revealing private conversations, trade secrets, and privileged and other confidential information); *see also In re Houstonian Campus, L.L.C.*, 312 S.W.3d 178, 184 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding) (considering harm party resisting discovery might suffer as result of revealing members' names).[11]

---

10. *See also In re Alford Chevrolet-Geo*, 997 S.W.2d 173, 181 (Tex. 1999) (orig. proceeding) ("The party must produce some evidence supporting its request for a protective order."); *cf. In re Campbell*, No. 03-10-00389-CV, 2010 WL 3431712, at *2 (Tex. App.—Austin Aug. 31, 2010) (orig. proceeding) (mem. op.) (concluding trial court abused discretion when it granted protective order because movant failed to submit evidence of injury).

11. Chem32 also argued in response to Eurecat's motion to compel that the discovery sought included trade secrets. In deciding whether to order disclosure of trade secrets,

courts likewise balance "the degree of the requesting party's need for the information with the potential harm of disclosure to the resisting party." *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 613 (Tex. 1998) (orig. proceeding). Eurecat confirmed that it intended to ask customers what Chem32 used to sell products and services to customers, which could include trade secrets and confidential information. *Cf.* Tex. Civ. Prac. & Rem. Code § 134A.002(3)(B)(ii) (West Supp. 2016) (recognizing that trade secret can be misappropriated from third party who has duty to maintain its secrecy or limit its use).

**B. The trial court acted within its discretion by preventing Eurecat from serving discovery on eighty-nine third-party customers.**

█ We have seen this discovery dispute twice before. The trial court signed a protective order preventing third-party discovery that Eurecat sought to obtain from a list of eighty-nine of its customers other than Haldor Topsoe. Eurecat sought mandamus relief from the order, which another panel of this Court denied in a reasoned opinion. *See In re Eurecat US, Inc.*, 425 S.W.3d at 583. Eurecat subsequently moved the trial court to reconsider the protective order and the trial court denied that motion. Eurecat once again sought mandamus relief in this Court, which the same panel denied. *See In re Eurecat US, Inc.*, 2014 WL 2547595, at *1.

Our opinions on these mandamus petitions discuss most of the pertinent background. We do not repeat all of that information here, but a few additional facts are relevant. Following the denial of Eurecat's first mandamus petition, Chem32 identified the customers on Eurecat's list that it had contacted, and the trial court signed an agreed discovery order directing both sides to produce certain documents—including invoices and proposals to provide services—concerning those sixteen customers. The order also directed the parties to produce the same documents concerning three additional companies that were not on Eurecat's original list of eighty-nine companies. At a hearing held on April 29, 2014, the trial court noted that discovery among the parties could have been used to limit the scope of Eurecat's requested third-party discovery and mitigate any resulting harm to appellees.

In this appeal, Eurecat renews its arguments that the trial court abused its discretion by signing the protective order, which it contends: (1) categorically prohibited any discovery into Chem32's business with third parties, an area Eurecat argues is reasonably calculated to lead to the discovery of admissible evidence; (2) was not based on competent evidence; and (3) denied discovery on a matter put in issue by appellees.[12] Eurecat goes on to argue that the protective order was harmful for two reasons. First, Eurecat contends the discovery it was allowed to take from Haldor Topsoe revealed Marklund and Wene had secretly solicited Haldor Topsoe before they resigned from Eurecat. According to Eurecat, "because appellees had lied about their pre-resignation communications with Topsoe, they most likely lied about their pre-resignation communications with other customers as well." Second, Eurecat asserts the protective order was harmful because appellees exploited it during closing argument by pointing out Eurecat's failure to present third-party testimony that Wene revealed Eurecat trade secrets.[13]

---

**12.** Eurecat also asserts in its first and second issues that the trial court abused its discretion when it denied the motion to reconsider the entry of the protective order. Because Eurecat makes the same arguments regarding both the order and the motion to reconsider, we do not separately address the trial court's denial of the motion to reconsider.

**13.** The challenged argument addressed Eurecat's claim that Wene breached his contract by revealing trade secrets and confidential information. Appellees' attorney told the jury:

Now, diligence in protecting trade secrets and confidential information. This goes back to the question you need to ask yourself: Did they provide any evidence that Mr. Wene—Mr. Wene, not them, not the bad guys—did Mr. Wene do anything—did they put on any evidence that he failed to do this? The answer is clearly no.
Divulge. Where is the third party that came here, sat in this chair, and said, Yeah, Doug Wene told me a trade secret—. . . .

We begin our analysis of these arguments by considering whether the trial court abused its discretion. Eurecat initially argues that the trial court unreasonably restricted Eurecat's access to information when it granted the protective order because the proposed discovery would have led to admissible evidence of whether Marklund and Wene solicited other customers before resigning. This potential relevance, however, is not sufficient by itself to show that a protective order was improper. *See* Tex. R. Civ. P. 192.4, 192.6 (authorizing trial court to limit or prevent discovery regarding otherwise-relevant matters in appropriate circumstances); *Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 553 (Tex. 1990) ("Thus the trial court has discretion to narrow the scope of discovery on a case by case basis with a protective order."). Moreover, Eurecat's characterization of the trial court's order as a categorical prohibition of discovery regarding Chem32's business with third parties is not supported by the record. The trial court never prohibited discovery regarding Chem32's relationship with Haldor Topsoe. It also ordered Chem32 to produce records regarding its relationship with sixteen Eurecat customers that Marklund and Wene identified as companies Chem32 had done business with or had contacted. Finally, Eurecat acknowledged in its second mandamus petition that it had alternative means of discovery regarding Chem32's business with third parties, and the trial court noted the possibility of narrower third-party discovery following discovery among the parties.

Turning to the evidentiary basis for the order, Eurecat argues it should have been allowed to take discovery regarding Chem32's business with third parties because prior discovery regarding appellees' solicitation of Haldor Topsoe had called their credibility into question, and it should not be forced to rely on their self-serving discovery responses. Eurecat also contends that the discovery sought was directly relevant to, and necessary to defend against, Chem32's antitrust counterclaim. Eurecat asserts that appellees' efforts to avoid this necessary discovery were not supported by competent evidence establishing a particular, specific, and demonstrable injury.

When Eurecat informed appellees of its intent to go forward with third-party discovery, appellees filed their motion for protection along with a notebook containing evidence for inspection by the trial court.[14] The notebook contained, among other things: (1) evidence that appellees allowed an independent forensic expert to analyze their computers and retrieve emails, and the resulting discovery provided to Eurecat (which appellees designated as confidential) showed contacts with Haldor Topsoe; (2) later emails between Eurecat's attorney and Haldor Topsoe in which Eurecat accused Haldor Topsoe of participating in the misappropriation of Eurecat's confidential and proprietary information by doing business with Chem32, and which resulted in Eurecat and Haldor Topsoe signing a covenant not to sue and Haldor Topsoe's agreement to cease doing business with Chem32; (3) deposition testimony from Haldor Topsoe vice president Henrik Rasmussen that Haldor Topsoe ceased doing business directly with Chem32 as a result of the emails from Eurecat;[15] and (4) Jardin's deposition tes-

---

14. Although this evidence was submitted for inspection in camera, much of it was also attached to later filings and therefore appears in the clerk's record.

15. Eurecat contends that Haldor Topsoe refused to cease its business with Chem32. To the contrary, Rasmussen testified that as a result of the emails, Chem32 can no longer invoice Haldor Topsoe for catalyst (as Eurecat

timony admitting that he discussed the litigation between Eurecat and appellees with other third parties such as Axens, Albemarle, ExxonMobil, and EOP—all potential suppliers or customers of Chem32.

Based on this evidence, the trial court could have found that Eurecat used discovery showing a relationship between Chem32 and Haldor Topsoe to interfere with that relationship in violation of the parties' confidentiality agreement. That agreement prevented Eurecat from using confidential information produced in discovery except in the course of the proceeding, and it expressly prohibited the use of such information for any business or competitive purpose.[16] The court could also have found that Chem32 lost business as a result of the breach, which is evidence of a particular, specific, and demonstrable injury. *See Garcia*, 734 S.W.2d at 345 (holding evidence that adequately identified facts requiring protection supported order, but conclusory statements unsubstantiated by specific examples or articulated reasoning would not).[17] Finally, before the trial court ruled on Eurecat's motion for reconsidera-

tion, Chem32 stipulated that it was limiting its counterclaim to its lost business relationship with Haldor Topsoe, thereby negating Eurecat's need for additional third-party discovery on the counterclaim.

■ In deciding whether to grant appellees' request for a protective order, it was the province of the trial court to balance, among other things, Eurecat's evidence that appellees provided untruthful discovery responses regarding solicitation of Haldor Topsoe, appellees' evidence that Eurecat breached the parties' confidentiality agreement and sought to use the discovery process and contacts with third parties to harm Chem32 as a competitor, and the availability of other avenues of discovery. Under these circumstances, we hold it was not an abuse of discretion for the trial court to decide that the burden of discovery from eighty-nine third parties (including potential harm to Chem32) outweighed its likely benefit to Eurecat. Tex. R. Civ. P. 192.4(b), 192.6(b). We therefore need not address Eurecat's harm argument.[18] We overrule Eurecat's first and second issues.

can), but instead must try to sell its catalyst to refineries directly. To the extent there were conflicts in Rasmussen's testimony, the trial court could resolve them in ruling on the motion.

**16.** Eurecat notes that the agreement provides confidential information may be "disclosed" to recipients of such information, which Haldor Topsoe was. But appellees' complaint is not that Eurecat disclosed confidential information to Haldor Topsoe; it is that Eurecat used that information to persuade Haldor Topsoe to cease doing business with Chem32. As discussed above, the confidentiality agreement also includes separate provisions restricting "use" of confidential information, and the trial court could have found from the evidence that Eurecat violated the provisions mentioned.

**17.** Appellees' supporting evidence distinguishes this case from *In re Campbell*, 2010

WL 3431712, at *2, in which the party moving for protection produced no such evidence.

**18.** To the extent Eurecat's second issue can be construed as arguing that the challenged jury argument, standing alone, is an error sufficient to reverse the judgment, we disagree. Even if we assume without deciding that the argument was improper, Eurecat must still "show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence." *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979); *Metro. Transit Auth. v. McChristian*, 449 S.W.3d 846, 855–56 (Tex. App.—Houston [14th Dist.] 2014, no pet.). To make this determination, we must examine the improper jury argument in light of the entire case. *Haryanto v. Saeed*, 860 S.W.2d 913, 919–20 (Tex. App.—Houston [14th Dist.] 1993, writ denied). We must look at the length of the argument, whether it was

## II. The trial court did not abuse its discretion in refusing Eurecat's proposed instructions regarding breach of fiduciary duty.

In its third and fourth issues, Eurecat contends the trial court improperly instructed the jury on its claims for breach of fiduciary duty because the charge failed to state the law accurately as applied to at-will employees.

### A. Standard of review

A trial court must submit in its charge to the jury all questions, instructions, and definitions that are raised by the pleadings and the evidence. *See* Tex. R. Civ. P. 278; *E.I. DuPont de Nemours & Co. v. Roye*, 447 S.W.3d 48, 56 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd) (citing *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663–64 (Tex. 1999)). The parties have the right to be judged by a jury properly instructed in the law. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000). The goal, therefore, is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. *Roye*, 447 S.W.3d at 56. To achieve this goal, trial courts enjoy broad discretion so long as the charge is legally correct. *Id.* Determining what jury instructions are necessary and proper is within the trial court's discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). When a trial court refuses to submit a requested instruction or definition, the issue on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 405 (Tex. App.—Houston [14th Dist.] 1997, writ dism'd by agr.). We review that decision for an abuse of discretion. *Shupe*, 192 S.W.3d at 579.

### B. Additional instructions on the fiduciary duty of an at-will employee to his employer were not reasonably necessary.

Eurecat's arguments focus on question one of the court's charge, which asked the jury:

Did a party named below fail to comply with his fiduciary duty to Eurecat?

Marklund and Wene owed Eurecat fiduciary duties during their employment by Eurecat.

You are instructed that during their employment, employees owe a fiduciary duty to their employers and have a duty to act primarily for the benefit of the employer in matters connected with his employment.

An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed. Such an employee has no general duty to disclose his plans to his employer, and generally may secretly join other employees in the endeavor without violating any duty to his employer.

There are certain limitations on the conduct of an employee who plans to compete with his employer. An employee does not comply with his fiduciary duty if, for example, he—

(a) Misappropriated his employer's trade secrets;

---

repeated or abandoned, whether there was cumulative error, and the probable effect of the argument on a material finding. *Id.* Here, the argument was very brief and it occurred at the end of a lengthy trial and during a two-hour closing argument. Appellees' counsel did not repeat the argument. Finally, at the end of

the arguments, the jury answered "yes" to Question 6, the question at issue during the challenged argument, finding that Wene breached the 1999 Patent and Trade Secret Agreement. We conclude that the improper argument was not harmful.

(b) Solicited his employer's customers while still working for the employer; or

(c) Carried away lists of customers.

Answer "Yes" or "No" as to each of the following:

Marklund: _____

Wene: _____

The jury answered "No" for each.[19]

During the charge conference, Eurecat asked the trial court to instruct the jury that "an employee may not (1) appropriate the company's trade secrets; (2) solicit his employer's customers while still working for his employer; (3) solicit the departure of other employees while still working for his employer; or (4) carry away confidential information." Eurecat cited *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 512 (Tex. App.—Houston [1st Dist.] 2003, no pet.), in support of this requested instruction. Eurecat contends that the trial court erred because it refused to instruct the jury on two of these limitations: (1) an employee's duty to not solicit the departure of other employees while still working for his employer; and (2) the duty to not carry away his employer's confidential information.[20] We examine each requested instruction in turn.

**1. No evidence supported Eurecat's requested instruction on solicitation of fellow employees.**

Question one did not define "solicit."[21] We therefore look to its commonly understood meaning in order to determine whether the instruction was reasonably necessary. *See In re Athans*, 478 S.W.3d 128, 134–35 (Tex. App.—Houston [14th Dist.] 2015) (orig. proceeding) (applying common understanding of "solicit" in sufficiency analysis). The "commonly understood meaning of the term 'solicit' is to 'make petition to: ENTREAT, IMPORTUNE, CONCERN'; 'to approach with a request or a plea (as in selling or begging)'; 'to move to action; serve as an urge or incentive: INCITE;' 'to strongly urge (as one's cause or point): insist upon'; 'to endeavor to obtain by asking or pleading'; and 'to seek eagerly or actively.'" *Id.* at 135 (quoting Webster's Third New Int'l Dictionary 2169 (1993)). Put another way, "the commonly understood meaning of 'solicit' includes more than merely to ask." *Id.* This definition is consistent with the approved contours of at-will employee actions to start a new business with fellow employees. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201 (Tex. 2002) (stating that at-will employee may properly plan to go into competition with employer, may take active steps to do so while still employed, and may secretly join other employees in the endeavor without violating any duty owed to employer); *Abetter Trucking*, 113 S.W.3d at 512 (stating that supervisor–manager cannot act as corporate pied piper and lure away all of his

19. We quote the question and instructions in full only to provide context for the specific challenges discussed below. We express no opinion regarding the propriety of the instructions given. Instead, we focus on the parties' arguments regarding whether additional instructions should have been given.

20. In its opening brief, Eurecat also argued that the court's charge erroneously instructed the jury that Marklund and Wene could properly plan to go into competition with Eurecat because (1) that rule does not apply to senior-level employees; and (2) they had contracted away their right to prepare to compete with their former employer. Eurecat concedes in its reply brief that these arguments were not preserved below. We therefore do not address them.

21. Eurecat did not object to the lack of a definition, ask the trial court to include a definition, or submit a proposed definition.

employer's personnel and thereby destroy employer's business).

Under this definition, there is no evidence that Wene solicited Marklund (or anyone else) to leave Eurecat and join him in competing with their former employer. What the evidence shows instead is that Marklund, who had been told he was losing his position as president of the company, encountered his friend Wene in a parking lot. Marklund told Wene he was uncertain about his future at Eurecat and that he needed to start looking for something else to do. The evidence further shows that Wene then told Marklund he should consider starting a company with him to compete against Eurecat. Marklund and Wene then made the joint decision to investigate the possibility of forming a competing business, which came to fruition about a year later. Therefore, the only evidence in the record is of actions taken by at-will employees that are permitted under Texas law: mutually agreeing among themselves to plan and prepare secretly to compete with their employer. *See Johnson*, 73 S.W.3d at 201. Because there is no evidence that Wene solicited Marklund, an instruction regarding solicitation of fellow employees was not reasonably necessary to enable the jury to reach a proper verdict, and the trial court did not abuse its discretion when it refused Eurecat's first proposed instruction. *Cf. Virginia Oak Venture, LLC v. Fought*, 448 S.W.3d 179, 196 (Tex. App.—Texarkana 2014, no pet.) (holding trial court did not abuse discretion when it refused to submit fraud question to jury because no evidence supported submission).

**2. The substance of Eurecat's proposed instruction on not carrying away confidential information was included in the charge.**

█ Eurecat also challenges the trial court's rejection of its proposed instruction that an employee breaches his fiduciary duty by carrying away his employer's confidential information. According to Eurecat, the trial court should have submitted the proposed instruction because the evidence indicated that Marklund and Wene "knowingly appropriated computers, hard drives, files, software programs, and other property containing Eurecat's confidential and proprietary information without Eurecat's permission," and also disclosed confidential Eurecat information to Haldor Topsoe.

In making this argument, Eurecat overlooks that question one separately defines the duty owed as one "to act primarily for the benefit of the employer" and then offers certain "example[s]" of how that duty may be breached.[22] Eurecat does not argue on appeal that the instruction regarding the duty owed is erroneous, nor does it argue that carrying away confidential information would not breach that stated duty. Moreover, among the examples of how the duty may be breached are carrying away customer lists and misappropriating trade secrets. In light of Eurecat's allegations against Marklund and Wene, and the evidence introduced at trial, the two examples given are the functional equivalent of Eurecat's proposed and rejected instruction.[23] The trial court therefore did not abuse its discretion when it refused the instruction. See Tex. R. Civ. P.

---

**22.** We express no opinion regarding the correctness of these instructions.

**23.** In its Second Amended Petition, Eurecat alleged that Marklund and Wene were heavily involved in the development of Eurecat's proprietary manufacturing processes and were also deeply involved in Eurecat's marketing and sales activities, giving them knowledge of customer education plans, sales pricing, customer information, and business plans.

278 ("A judgment shall not be reversed because of the failure to submit other and various phases or different shades of the same question."); *Dallas Area Rapid Transit v. Agent Sys. Inc.*, No. 02-12-00517-CV, 2014 WL 6686331, at *4 (Tex. App.—Fort Worth Nov. 26, 2015, pet. denied) (mem. op.) ("Because the submitted question does not differ in substance from appellants' requested instruction, but merely in wording, the trial court did not err."); *Mo. Pac. R.R. Co. v. Lemon*, 861 S.W.2d 501, 515 (Tex. App.—Houston [14th Dist.] 1993, writ dism'd) ("[T]he trial court does not err in refusing a requested instruction if the substance of the matter contained in the requested instruction was included in the court's charge."). We overrule Eurecat's third and fourth issues.

## III. Sufficient evidence supports the jury's failure to find that Marklund and Wene breached their fiduciary duties to Eurecat.

When asked in question one (quoted above) whether Marklund or Wene breached their fiduciary duties to Eurecat, the jury answered "No" for each. Eurecat argues in its fifth and sixth issues that the evidence is legally and factually insufficient to support these answers.

### A. Standard of review

A party attacking the legal sufficiency of the evidence supporting an adverse finding on an issue on which it had the burden of proof must demonstrate that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that supports it. *Univ. Gen. Hosp., L.P. v. Prexus Health Consultants, LLC*, 403

S.W.3d 547, 550 (Tex. App.–Houston [14th Dist.] 2013, no pet.). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *Id.* at 551. We must credit favorable evidence if a reasonable trier of fact could, and disregard contrary evidence unless a reasonable trier of fact could not. *Id.* The trier of fact is the sole judge of the witnesses' credibility and the weight to afford their testimony. *Id.*

In reviewing the factual sufficiency of the evidence, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When a party attacks the factual sufficiency of an adverse finding on which it had the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *Barnhart v. Morales*, 459 S.W.3d 733, 745 (Tex. App.—Houston [14th Dist.] 2015, no pet.). This Court is not a factfinder. *Id.* (citing *Ellis*, 971 S.W.2d at 407). Instead, the jury is the sole judge of the credibility of the witnesses and the weight to afford their testimony. *Id.* When presented with conflicting evidence, a jury may believe one witness and disbelieve others, and it also may resolve inconsistencies in the testimony of any witness. *Magana v. Citibank, N.A.*, 454 S.W.3d 667, 681–82 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). We may not, therefore, pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would also support a different result. *Id.* If we determine the evidence is factually insufficient, we must detail the

evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming. *Id.* (citing *Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006) (per curiam)).

**B. Under the charge as given, neither conclusive evidence nor the great weight of evidence supports a breach of fiduciary duty.**

Eurecat argues that the evidence introduced during the trial conclusively proved that Marklund and Wene violated fiduciary duties arising out of their contracts with Eurecat, as well as "a variety of conflict-of-interest, confidentiality, and company asset protection policies, including those stated in Eurecat's Employee Handbook." Eurecat asserts that Marklund's and Wene's contract- and policy-based duties required them to (1) preserve and protect Eurecat's trade secrets and confidential information; (2) promptly report all work-related inventions, ideas, and improvements; (3) recognize Eurecat's ownership of all work related inventions, ideas and improvements; (4) avoid conflicts of interest; (5) refrain from using company assets for personal benefit; and (6) devote their time and efforts exclusively to Eurecat.

Parties may contractually agree to limit or expand fiduciary duties that would ordinarily exist under the common law. *See Nat'l Plan Adm'rs v. Nat'l Health Ins., Co.*, 235 S.W.3d 695, 703 (Tex. 2007) (recognizing parties' agreement to limit fiduciary duties of agent to principal); *Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 846–47 (Tex. 2005) (sustaining objection to jury instruction for failure to reflect contractual limitation of fiduciary duties). These alleged contract-based fiduciary duties were not, however, included in the charge.[24] Eurecat did not object to their absence during the formal charge conference, nor did it request any proposed instructions encompassing the alleged duties. *See* Tex. R. Civ. P. 274 ("Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections."); *Burbage v. Burbage*, 447 S.W.3d 249, 257–58 (Tex. 2014) (stating objection to charge must apprise trial court of alleged error so trial court has opportunity to correct problem); *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 831 (Tex. 2012). Therefore, evidence of failures to comply with contracts and policies does not impact the sufficiency of the evidence supporting the jury's answers regarding breach of fiduciary duty.[25] *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (holding that, when no objection is brought to trial court's attention, sufficiency is measured against charge actually given).

Eurecat also argues that the jury's answer to question one is incorrect as a matter of law because Marklund and Wene owed broad fiduciary duties to Eurecat,

---

24. *Cf.* Comm. on Pattern Jury Charges, State Bar of Texas, Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment PJC 104.4–104.5 (2016) (recommending that question list duties using language from applicable agreement). We express no opinion regarding whether any such duties were fiduciary in nature. We note that separate questions were submitted to the jury asking whether Marklund and Wene breached certain of their contracts with Eurecat.

25. These purported failures include (1) developing Chem32's processes and programs with Eurecat's computers, software, and files; (2) conducting Chem32 business on Eurecat phones and computers; and (3) failure to return all Eurecat files, software, and other property upon Marklund and Wene resigning from Eurecat.

including duties (1) of candor, unselfishness, and good faith; (2) to place Eurecat's interest before their own; (3) to make full disclosure of all material facts within their knowledge related to Eurecat's business; and (4) to not usurp any perceived corporate opportunities. Eurecat goes on to argue that the evidence conclusively proved that Marklund and Wene violated these broad duties by failing to disclose their plans to start a competing business using a fixed-bed reactor to produce small batches of activated catalyst.

These duties likewise are not included in the charge. Although Eurecat did make the trial court aware that it wished to have the jury instructed on some (but not all) of the duties, it does not assign the trial court's failure to include those instructions in the charge as error on appeal. Therefore, these duties likewise do not frame our examination of the sufficiency of the evidence. *Osterberg*, 12 S.W.3d at 55.[26]

Having addressed the additional legal standards Eurecat proposes, we examine the sufficiency of the evidence against the charge actually given with one exception. Because the jury found in answer to Question No. 8 that Eurecat did not have any trade secrets, we do not consider the first breach example—that an employee breaches his fiduciary duty if he misappropriates his employer's trade secrets—in resolving Eurecat's sufficiency challenge.

*Cf. Magana,* 454 S.W.3d at 684–85 (refusing to consider sufficiency challenge to jury's answers to immaterial questions).

■ Turning to the evidence, Eurecat contends that Marklund breached his fiduciary duty by failing to disclose that Wene approached him about forming a competing business, and that Wene violated his fiduciary duty by soliciting Marklund with the idea. We have already determined that there was no evidence that Wene solicited Marklund's participation in his competing business idea. The evidence instead shows that Wene broached the idea to his friend Marklund and the two then collectively began investigating and planning for the competing business. These activities fall within an at-will employee's competition rights, on which the jury was instructed.[27] These activities therefore do not conclusively establish that Marklund and Wene breached their fiduciary duties to Eurecat. They also do not establish that the jury's negative answers to question one are against the great weight and preponderance of the evidence.

■ Eurecat also asserts that Marklund and Wene breached their fiduciary duties by failing to disclose to Eurecat a corporate opportunity: the idea of using a fixed-bed reactor to produce smaller quantities of activated catalyst. Even if we assume without deciding that this failure to disclose is not protected by an at-will em-

---

**26.** In addition, we have observed that some fiduciary duties are tempered when an employee is planning to compete. *See PAS, Inc. v. Engel,* 350 S.W.3d 602, 614 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("Thus, in general, an at-will employee—even a fiduciary one—may plan to compete with his employer and take certain steps toward that goal without disclosing his plans to the employer, but he may not appropriate his employer's trade secrets, solicit his employer's customers while still working for his employer, carry away certain information, such as lists of customers, or act for his future interests at the ex-

pense of his employer by using the employer's funds or employees for personal gain or by a course of conduct designed to hurt the employer." (internal quotation marks omitted))

**27.** The trial court instructed the jury that "an at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed. Such an employee has no general duty to disclose his plans to his employer, and may secretly join other employees in the endeavor without violating any duty to his employer."

ployee's right to prepare to compete with his employer while still employed, the evidence in the record is undisputed that the idea of using a fixed-bed reactor was already well-known to Eurecat, had been discussed by Eurecat, and had been rejected in favor of higher-yield production methods. The evidence was also undisputed that the moving-bed technology Eurecat uses is capable of producing smaller quantities and there was no need to install a fixed-bed reactor to accomplish that task. Thus, Marklund's and Wene's failure to disclose their idea of using a fixed-bed reactor does not conclusively establish that they breached their fiduciary duties to Eurecat. Nor does it establish that the jury's negative answers to question one are against the great weight and preponderance of the evidence.

▬▬▬ Finally, Eurecat contends that the evidence conclusively established Marklund breached his fiduciary duty to Eurecat when he allegedly (1) informed Haldor Topsoe of the plan to start a business competing with Eurecat; (2) revealed confidential Eurecat information to Haldor Topsoe; and (3) solicited business from Haldor Topsoe for Chem32 while still employed by Eurecat. With respect to Eurecat's contention that Marklund informed Haldor Topsoe of the plan to start a competing business, this activity falls within the rights an at-will employee has to actively prepare to compete with his current employer, and therefore is not evidence of a breach of fiduciary duty.

There is conflicting evidence in the record regarding Eurecat's second and third contentions: that Marklund revealed confidential information to Haldor Topsoe and that he solicited business from Haldor Topsoe while still employed. Marklund testified that the information he revealed to Haldor Topsoe in his meetings was not confidential, but was instead information commonly shared with customers, well known in the field, and even publicized by Eurecat itself. Marklund denied soliciting business from Haldor Topsoe while still employed by Eurecat. According to Marklund, he instead sought feedback on the wisdom of starting a new company to compete with Eurecat and sought a letter of intent that could be used in his effort to obtain financing for the start-up. Marklund further testified that he was not in a position to solicit business from Haldor Topsoe during the meetings in question because there was not yet a business in existence, they did not yet have a factory, and had not produced the required samples to demonstrate an ability to produce activated catalyst meeting Haldor Topsoe's requirements.

When viewed in the light most favorable to the challenged finding and indulging every reasonable inference that supports it, the evidence does not conclusively establish that Marklund breached his fiduciary duty to Eurecat by revealing confidential information or by soliciting business while still employed by Eurecat. In addition, the jury is allowed to believe the testimony of one witness and disbelieve the testimony of others, and to resolve any inconsistencies in the evidence. The fact it resolved any conflicts in favor of appellees does not render the evidence factually insufficient to support the jury's answer to question one. *See Magana*, 454 S.W.3d at 684.

We hold the evidence is legally and factually sufficient to support the jury's negative answers to question one. We overrule Eurecat's fifth and sixth issues.

**IV. The trial court did not err in granting appellees' motion for directed verdict on Eurecat's breach of contract claims based on the Patent and Trade Secret Agreements.**

Eurecat alleged claims for breach of contract against both Marklund and Wene.

Eurecat asserted that Marklund breached three agreements: a 1999 Employee's Patent and Trade Secret Agreement, a Letter Agreement signed in 2005, and a 2011 Employee's Patent and Trade Secret Agreement. Eurecat asserted Wene breached two agreements: a 1999 Employee's Patent and Trade Secret Agreement and a 2011 Employee's Patent and Trade Secret Agreement. Eurecat contended that the later agreements did not replace the earlier, but instead all five agreements remained in effect.

Appellees orally moved for a directed verdict on Eurecat's breach of contract claims against (1) Marklund, based on the 1999 and 2011 Patent and Trade Secret Agreements; and (2) Wene, based on the 2011 Patent and Trade Secret Agreement.[28] Appellees argued these three contracts lacked consideration and were therefore unenforceable. Appellees also argued that the undisputed evidence established that Marklund was not a Eurecat employee until 2005, so he could not have signed a Patent and Trade Secret Agreement in 1999. The trial court orally granted appellees' motion. Eurecat challenges this ruling in its seventh, eighth, and ninth issues.

### A. Standard of review and applicable law

 A directed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled, as a matter of law, to judgment. *Tanglewood Homes Ass'n v. Feldman*, 436 S.W.3d 48, 66 (Tex. App.— Houston [14th Dist.] 2014, pet. denied). When reviewing a directed verdict, an appellate court views the evidence in the light most favorable to the party against

whom the verdict was rendered. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curiam). When reviewing a directed verdict on a legal issue, we consider all the evidence presented at trial, viewing it in the losing party's favor "as much as the record allows." *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996). We may consider any reason why the directed verdict should have been granted, even if not stated in the party's motion. *Indus. III, Inc. v. Burns*, No. 14-13-00383-CV, 2014 WL 4202495, at *8 (Tex. App.—Houston [14th Dist.] Aug. 26, 2014, pet. denied) (mem. op.).

 When alleging that a defendant breached a contract, a plaintiff must prove the following elements: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). For the contract to be valid, it must be supported by consideration. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408 (Tex. 1997); *Marx v. FDP, L.P.*, 474 S.W.3d 368, 378 (Tex. App.—San Antonio 2015, pet. denied). A new contract must be supported by new consideration. *Pointe West Ctr., L.L.C. v. It's Alive, Inc.*, 476 S.W.3d 141, 152 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). A contract that lacks consideration is unenforceable. *Hall v. Hubco, Inc.*, 292 S.W.3d 22, 28 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (op. on reh'g). What constitutes consideration is a question of law. *Id.*

### B. Marklund did not sign a 1999 agreement with Eurecat, and no consideration supports the 2011 agreements.

---

28. Appellees did not dispute that Eurecat had a contract with both employees. They asserted the relevant contracts were Marklund's 2005 Letter Agreement and Wene's 1999 Employee's Patent and Trade Secret Agreement.

We turn first to the 1999 Patent and Trade Secret Agreement allegedly signed by Marklund. No such agreement appears in the record, and Eurecat conceded during trial that it did not possess a copy signed by Marklund.[29] Marklund disputed signing a Patent and Trade Secret Agreement in 1999, testifying instead that he was bound by duties like those stated in Wene's agreement. In addition, the undisputed evidence established that Marklund was not a Eurecat employee until 2005 and therefore could not have signed an employee trade secret agreement with Eurecat in 1999.[30] We hold the trial court did not err when it granted the motion for directed verdict on Eurecat's breach of contract claim based on Marklund's alleged 1999 Employee's Patent and Trade Secret Agreement. *Tanglewood Homes Ass'n*, 436 S.W.3d at 66.

■■■ We next consider whether the 2011 Patent and Trade Secret Agreements were supported by consideration. The answer to this question depends in part on the nature of Eurecat's agreements with Marklund and Wene prior to 2011.

It is undisputed that Marklund signed a Letter Agreement when he became a Eurecat employee in 2005. Among other things, this agreement provided that during Marklund's "employment and for a duration of 10 years afterwards, [he would] maintain an absolute confidentiality about the Eurecat or Petroval technical or business information that [he would] have knowledge of. Likewise, [he would] maintain strict confidentiality about any information resulting from a secrecy agreement

signed between Eurecat and a third party company."

It is also undisputed that Wene signed a Patent and Trade Secret Agreement in 1999. This agreement provided, in pertinent part:

> EMPLOYEE recognizes that as a result of his employment by Eurecat U.S. he may develop, obtain or learn about trade secrets or confidential information which is the property of EURECAT U.S. or which EURECAT U.S. is under obligation not to disclose; and EMPLOYEE agrees to use his best efforts and the utmost diligence to guard and protect said trade secrets and confidential information, and EMPLOYEE agrees that he will not during or after the period of his employment by EURECAT U.S., use for himself or others, or divulge to others any of said trade secrets or confidential information which he may develop, obtain or learn about during or as a result of his employment by EURECAT U.S., unless authorized to do so by EURECAT U.S. in writing. EMPLOYEE further agrees that if his employment by EURECAT U.S. is terminated for any reasons, he will not take with him but will leave with EURECAT U.S. all records and papers and all matter of whatever nature which contain said trade secrets or confidential information.

The only consideration stated in this agreement was Wene's employment with Eurecat.

Wene signed a second Patent & Trade Secret Agreement on January 31, 2011. This agreement was more detailed and

---

**29.** Eurecat argued Marklund's agreement was identical to Wene's 1999 Patent and Trade Secret Agreement.

**30.** Indeed, Marklund's Eurecat Hiring Checklist indicates that Marklund did not even sign an Employee Patent and Trade Secret Agreement when he became a Eurecat employee in 2005, nor is there a notation that he had previously signed one in 1999.

imposed additional duties on Wene. It provided, in pertinent part:

> Employee recognizes and acknowledges that as a result of employment by Eurecat U.S. Inc., Employee may develop, obtain or learn about trade secrets or confidential information (hereinafter collectively called "Confidential Information") which is the property of Eurecat U.S. Inc., or which Eurecat U.S. Inc. is under an obligation to a third party not to disclose. Employee agrees to use Employee's best efforts and the utmost diligence to guard and protect said Confidential Information. Employee further agrees that he/she will not, during or after Employee's period of employment by Eurecat U.S. Inc., use for himself or others or divulge to others any said Confidential Information which Employee may develop, obtain, or learn about during or as a result of Employee's employment by Eurecat U.S. Inc., unless authorized to do so by Eurecat U.S. Inc. in writing. Employee agrees that if employment with Eurecat U.S. Inc. is terminated by Employee or Eurecat U.S. Inc., with or without cause, Employee shall surrender to Eurecat U.S. Inc. all records and papers and all matter, of whatever nature, which contain said Confidential Information.

The only stated consideration was Wene's continued employment with · Eurecat. Eurecat asserted that Marklund signed an identical agreement. A 2011 Patent and Trade Secret Agreement signed by Marklund does not appear in the record, however.

In their motion for directed verdict, appellees argued that even assuming Marklund signed an agreement identical to Wene's, both 2011 agreements were unenforceable because neither was supported by consideration. On appeal, Eurecat responds that the two agreements were supported by consideration because it provided Wene and Marklund access to confidential information after they signed the 2011 agreements.

We conclude the 2011 Patent and Trade Secret Agreements are not supported by new consideration. *See Pointe West Ctr., L.L.C.,* 476 S.W.3d at 152. The only consideration stated in the agreements is continued employment.[31] Because both Marklund and Wene were at-will employees, a promise of continued employment is illusory and does not constitute consideration. *See Light v. Centel Cellular Co.,* 883 S.W.2d 642, 644–45 (Tex. 1994), *abrogated on other grounds by Marsh USA, Inc. v. Cook,* 354 S.W.3d 764, 779 (Tex. 2011) ("Consideration for a promise, by either the employee or the employer in an at-will employment, cannot be dependent on a period of continued employment.").[32]

Eurecat argues that it provided confidential information to both Marklund and Wene in the few months between the signing of the 2011 agreements on January 31 and their resignations, and that providing this information supplied sufficient consideration for their promises

---

**31.** As quoted above, Eurecat did not promise that it would provide confidential information to either Marklund or Wene. Instead, the agreements provided only that Marklund and Wene may develop, learn of, or have access to such information. *See Dallas Cnty. Cmty. Coll. Dist. v. Bolton,* 185 S.W.3d 868, 874 (Tex. 2005) ("The words 'may' and 'shall' mean different things, and ... [t]he context in this case does not require an interpretation of the permissive word 'may' to mean something other than its plain meaning.").

**32.** *See also J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 228 (Tex. 2003) ("At-will employment does not preclude formation of other contracts between employer and employee, so long as neither party relies on continued employment as consideration for the contract.").

to protect the information. As Eurecat notes, an employer's promise to provide confidential information need not be express and can supply consideration when the employer performs that promise by providing the information.[33] But in this particular case, as discussed above, Marklund and Wene already were required to maintain the confidentiality of Eurecat trade secrets and confidential information under their 2005 and 1999 agreements, respectively. Eurecat does not point to any evidence that its claims for breach of the 2011 agreements were based on disclosure of confidential information it provided to Marklund and Wene after January 31, 2011 that differed from information they previously possessed. *See Powerhouse Prods., Inc. v. Scott*, 260 S.W.3d 693, 697–98 (Tex. App.—Dallas 2008, no pet.) (holding confidential information employer provided ongoing employee prior to agreement could not supply consideration for agreement). Nor does Eurecat point to evidence that it provided any such different information because Marklund and Wene signed the 2011 agreements and not under the previous agreements—which Eurecat took pains to point out were still in force. *See id.* at 698–99 (concluding any post-agreement provision of confidential information to employee could not supply consideration, as evidence did not show employer had provided additional information "because [employee] signed the agreement"); *Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 319 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("A promise to fulfill a pre-existing obligation cannot serve as new consideration."). For these reasons, we overrule Eurecat's seventh, eighth, and ninth issues.

## V. Legally and factually sufficient evidence supports the jury's failure to find that Marklund breached the 2005 Letter Agreement.

Eurecat contends in its tenth issue that legally and factually insufficient evidence supports the jury's failure to find that Marklund breached the confidentiality provision in the 2005 Letter Agreement. This provision is discussed in Part IV above. According to Eurecat, the evidence establishes that Marklund breached the agreement three times: (1) he exploited Eurecat's $H_2S$ plant design in the design and construction of Chem32's plant; (2) he used Eurecat financial and accounting records to develop the Chem32 business plan; and (3) he disclosed confidential Eurecat sales projections, business strategies, and common customer complaints to Haldor Topsoe. We review this complaint under the same standard of review stated in Part III.A. above.

Question four of the jury charge asked whether Marklund failed to comply with the 2005 agreement. It instructed the jury "Marklund failed to comply only if, during his employment or afterwards, he failed to maintain an absolute confidentiality about (1) the Eurecat technical or business information of which he had knowledge, and (2) any information resulting from a secrecy agreement signed between Eurecat and a third-party company." Eurecat did not object to this instruction. Therefore, to succeed on appeal, Eurecat must show that the record contains conclusive evidence of both elements, or that the jury's failure to find those elements is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 241–42; *Osterberg*, 12 S.W.3d at 55.

Even if we assume that each of the three instances identified by Eurecat con-

---

33. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 850 (Tex. 2009); *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651, 655 (Tex. 2006).

clusively establish the first element in the instruction, Eurecat does not point out any evidence, much less conclusive evidence, that any of the three alleged disclosures meet the second. Because the jury was required to find both elements to conclude that Marklund breached the agreement, we hold that Eurecat has not shown that the evidence is legally or factually insufficient to support the jury's negative answer. We overrule Eurecat's tenth issue.

## Conclusion

Having overruled each of the issues raised by Eurecat in this appeal, we affirm the trial court's judgment.