**Affirmed and Memorandum Opinion filed June 3, 2021.**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00816-CV

### ALLEYTON RESOURCE COMPANY, A/K/A SUMMIT MATERIALS, LLC A/K/A ALLIED CONCRETE MATERIAL, Appellant

### V.

### JOSEPH BALL, Appellee

**On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Cause No. 17-DCV-241655**

## MEMORANDUM OPINION

After appellee Joseph Ball's employment with appellant Alleyton Resource Company, A/K/A Summit Materials, LLC, A/K/A Allied Concrete Material ("Alleyton") was terminated, Ball sued Alleyton, claiming that Alleyton terminated his employment in retaliation for filing a workers' compensation claim. A jury found in Ball's favor and Alleyton appeals from a final judgment signed following the jury trial. Finding no error, we affirm.

## BACKGROUND

Alleyton operates a concrete business. Appellee Joseph Ball started working for Alleyton in 2008 as a concrete mixer-truck driver. According to Henry Perry, Ball's supervisor, Ball was a hard worker and a good employee for Alleyton.

It is undisputed that Ball was injured while working on September 1, 2015. Ball reported his injury to Alleyton and he filed a workers' compensation claim. Ball also hired an attorney to handle his workers' compensation claim. Ball received medical treatment and then workers' compensation benefits starting in December 2015. Ball was then released to return to light-duty work. According to Ball, he did tickets documenting the delivery of loads of concrete by other drivers. Ball was released to return to full duty with no restrictions on January 15, 2016.

Although in pain from his work-related injury, Ball worked consistently after his release back to full duty. According to Ball, he told his employer that he was hurting as a result of his on-the-job injury, but he was showing up at work and doing his best, because he needed to provide for his family. Ball was always clear that he was working through the pain, but he could do his job.

In January or February of 2016, Stephen Gardner, Alleyton's Safety Director, told Erin Anderson, Alleyton's Director of Human Resources, that Ball "was talking about being in severe pain and having problems doing his job without assistance; and he asked me what options we might have to be able to help him out." Anderson testified that, as a result of this conversation, she and Gardner went to a job site to talk to Ball. Anderson testified that she offered Ball an unpaid leave of absence or short-term disability as options. Ball responded that he was not interested in either option, that he wanted to keep working because he needed the money. In the recorded conversation found in Plaintiff's Exhibit 2, Ball states he asked if Alleyton had any other potential jobs for him, Gardner and Anderson said

2

that they would get back to him, but they never did.

From the date Ball was released to return to work without any restrictions until the date he was terminated, Ball did not receive any write-ups, incident reports, or disciplinary actions. Perry admitted that Alleyton's rules required him to document any performance issues he observed Ball having, and to then report those issues to the human resources department.

Lisa Thomas worked as Alleyton's Safety Administrator. Thomas reported to Gardner. Thomas testified that she was familiar with Alleyton's "safety guidelines, standards, and principles." Thomas was also familiar with the industry's standards for job site safety programs, including safety-related discipline, and how an employer should treat employees seeking workers' compensation benefits. Thomas identified the safety rules that Alleyton's parent company, Summit Materials, expected Alleyton to follow. According to Thomas, to ensure effective compliance with safety rules by employees, Alleyton's discipline program should be: (1) communicated, (2) progressive, (3) fairly applied, (4) consistently enforced, and (5) documented. Thomas agreed that it was important for both Alleyton's employees and its supervisors to follow these rules. Thomas testified that the rules she identified applied whether there was a safety issue, a job performance issue, or a disciplinary issue. According to Thomas, an employer should treat employees who file workers' compensation claims fairly, should not discriminate against them, and should never retaliate against them for seeking workers' compensation benefits.

Thomas also testified that her job required her to coordinate treatment and return-to-work plans for injured workers. In addition she had to maintain complete, accurate, and timely workers' compensation files for each injured employee. Thomas also made regular reports to Alleyton's senior management

regarding workers' compensation claims. Thomas served as Alleyton's point of contact with Alleyton's workers' compensation insurance company. Thomas is required to review and maintain any workers' compensation files so she knows what is going on with that employee's claim. She is also responsible for making certain the files are accurate. Thomas works with the adjustors at Alleyton's insurance company and she listens to them and responds when they communicate with her. Thomas then reports that information to Gardner and others at Alleyton. One of those files was a claims diary for Ball's worker's compensation claim.

Gardner agreed that Alleyton's safety rules applied any time there was a safety-related issue, including terminations. Gardner also agreed that part of the purpose of the rules is to "confirm that an employer like Alleyton is being honest about the reason for termination and not attempting to conceal some other action like retaliation[.]"

Ball's claims diary shows that his workers' compensation attorney notified Alleyton's insurance adjustor on September 20, 2016 that he disagreed with, and would dispute, the workers' compensation doctor's decision that Ball had reached Maximum Medical Improvement and was fit to return to work without restrictions on September 18, 2016. That same day, the diary shows that Thomas called the adjustor requesting an update on Ball's claim. An October 7, 2016 entry in Ball's claims diary reflects that Ball had received new medical treatment for his on-the-job injury, and that the new doctor had determined that Ball had not reached Maximum Medical Improvement and would not do so until on or about December 6, 2016.

On October 11, 2016, Ball's worker's compensation attorney requested a Benefit Review Conference ("BRC") with the Texas Department of Insurance, Division of Workers' Compensation. A BRC is the start of formal proceedings in

4

administrative courts addressing workers' compensation claims. Ball's attorney notified the agency that his efforts to resolve Ball's claim with Alleyton's workers' compensation insurance company had failed because of a dispute over Ball's recovery from his on-the-job injury. The adjustor and Thomas then had extensive discussions about Ball's request for a BRC on October 14, 2016. According to the adjustor, Alleyton was having performance issues with Ball and was considering terminating him. Alleyton was asking the adjustor to refer Ball's file to Alleyton's local attorney. Thomas testified that she did not recall any of these discussions.

On October 12, 2016, Perry, Ball's supervisor, filmed Ball working at a job site. One of the videos shows Ball walking the three parts of the mixer truck's chute along the ground around to the back of the truck. The video showed that Ball was moving slowly, but Anderson, the human resources director, testified Ball was not terminated because he did his job slowly.[1] Perry testified that he believed Ball's method of moving the chutes was unsafe because Alleyton teaches the drivers to carry each chute piece on their shoulder. Perry explained that Ball's method was unsafe because if "he would mess around, trip and fall, he would fall on the chute." The second video shows Ball rinsing the concrete off the truck after he had unloaded the concrete. According to Perry, Ball did not perform this task in the proper manner. Perry did not testify that Perry's method for rinsing down the truck was unsafe. Perry instead testified that Ball's method was too slow because it takes "away from production." In Perry's view, Ball's pace reduced the number of times he could return to the plant and reload his truck.

Perry testified that, out of concern that Ball could get injured on a jobsite,

---

[1] Ball did not deny that he was moving slowly in the video. Ball explained that he was moving slowly because the video was made at about 5:00 p.m., he had started working that day at about three in the morning, and he was tired. Ball went on to explain that his normal work day started at 3:00 a.m. and it would end when they finished the work, which could be anywhere between 4:00 p.m. and 9:00 p.m.

he offered him another job working upstairs as "a backup batch man." According to Perry, Ball was not interested in the job because he could not walk up the stairs. Ball testified that Perry did not offer him a job, but instead hinted at one. Ball also denied rejecting the job because he could not walk up the stairs. Instead, according to Ball, he told Perry he would have to consider the whole situation, but he did not have the time at that point for further discussion because he was leaving the plant with another load.

At that point, Perry took his videos to Brad Bowman, the Vice President of Ready-Mix for Alleyton, and Perry's boss. Perry explained that he did so out of concern that Ball was going to hurt himself. According to Perry, Bowman was also concerned that Ball was going to hurt himself. Bowman then discussed the possibility of terminating Ball. Perry denied that he had any involvement in any meetings, discussions, or decisions related to Ball's employment. Bowman took Perry's videos to Anderson in human resources. Anderson testified that she in turn took the videos to Gardner. Gardner, however, testified that Perry showed him the videos.

Ball reported slipping and falling while on the job two days after Perry videoed his work. Gardner investigated the reported fall. Gardner asked Ball about seeing a doctor, questioned Ball about the doctors he had been seeing, and the medications Ball was taking. Ball told Gardner that he fell, but suffered no injury. Ball then told Gardner that he was always hurting on the job as a result of his previous on-the-job injury. When Gardner asked if Ball wanted to see a doctor about the "re-aggravation" of his injury, Ball once again denied that he had been injured or aggravated his previous injury when he fell that day.

The Alleyton witnesses during the trial each told different versions of how the decision was reached to terminate Ball. Anderson testified that once Perry's

6

videos made their way to the Alleyton office, there were various discussions concerning what to do about Ball. According to Anderson, there was no one meeting in which everyone involved in the termination decision participated. Anderson testified that Perry talked to Bowman, Bowman talked to her, and she talked to Gardner. While Anderson testified the same decision resulted from each of those conversations, Bowman testified that he, Anderson, and Gardner "got back together and talked about it a little bit; and that's when we agreed that it would be best to part ways with Mr. Ball." According to Bowman, the decision to terminate Ball was a collective decision motivated out of concern "about the safety of Mr. Ball going forward." Gardner on the other hand claimed that he ultimately participated in the termination meeting "[j]ust to be there" and to serve as a witness. Gardner also testified that Perry agreed Ball needed to be terminated. Perry, however, testified that he had "absolutely no involvement" in discussions concerning whether Ball should be fired. According to Perry, he did not remember if he was even asked the question. Perry testified that if there was testimony that he agreed with the decision to terminate Ball, that would be a false statement.

Bowman testified about factors that are weighed when Alleyton management was deciding whether to terminate an employee. The only factor Bowman mentioned was "additional cost on the company." Bowman, however, denied that costing the company money was a factor in the decision to terminate Ball. Bowman also testified to the speed at which ready-mix loads need to be delivered to a work site. According to Bowman, ready-mix loads are perishable. He explained the general rule of thumb is that a driver has about 90 minutes to transport the load to a job site and pour it. Failure to timely deliver a load could result in Alleyton's customer rejecting the load and sending it back, forcing Alleyton to replace the load at its own cost. According to Bowman, it costs

7

Alleyton about $90.00 an hour, or a $1.50 a minute, to operate a ready-mix truck.

Gardner was asked about Alleyton's workers' compensation insurance. Gardner testified it is a high-deductible plan and he believed the deductible amount is $500,000. He then agreed that, because of that high deductible, the money for Ball's workers' compensation medical treatment and other benefits was coming out of Alleyton's pocket.

On October 14, 2016, Anderson and Gardner terminated Ball. Anderson testified that Alleyton's management decided to terminate Ball because "he was unable to perform the essential functions of his job." Anderson further testified that she told Ball "why he was being terminated at that meeting." Anderson admitted during trial that all she told Ball during the termination meeting was that he was not a "good fit." Anderson characterized Ball as very "combative," and told the jury "I was not going to spend my afternoon arguing with somebody that we had decided to terminate."

Ball recorded the termination meeting. The recording was played for the jury during the trial. During the meeting, after he was told that he was being fired because it was "in the best interest of everybody," Ball kept asking for a reason that he was being fired. Gardner and Anderson repeatedly refused to explain why Ball was being fired beyond that it was the best thing for Alleyton. Anderson promised that she would try to give Ball documentation explaining the reason for termination at a later time. Anderson and Alleyton never provided any termination documentation to Ball. In addition, Anderson did not complete Alleyton's own termination form until several days later.

Ball testified that Gardner and Anderson did not give him a reason, but simply said that they were terminating him. According to Ball, Anderson stated "there is no reason. It was in their best interest, but there was no reason." Ball

8

also told the jury: "I am still baffled today about the reason." Ball testified that Alleyton never gave him any type of documentation or paperwork explaining why he was terminated. Ball also testified that, prior to October 14, 2016, Alleyton had not given him any documented "write-ups" related to any performance or safety issues.

Thomas testified that "ideally," Ball should have been told on October 14, 2016 why he was being terminated. Thomas continued that Alleyton should tell an employee why a disciplinary action or termination occurred so that there is no misunderstanding between the parties. Thomas agreed that honesty was important, in part, because it protects everyone involved. Thomas, during her trial testimony, could not think of a reason why Alleyton would not tell an employee who was being terminated for a safety violation the reason he or she was being fired.

Thomas explained that by "progressive," the Alleyton rules mean that discipline needs to come in steps. According to Thomas, Alleyton expects that when there is a progression or pattern of safety issues, they should be documented in writing close in time to when they occurred. She also believed it was important for those written documents to be communicated to the employee. Thomas agreed that an employer should not, after the fact, change the reasons for a termination. In her opinion, doing so would be acting on a pretext and dishonest. Additionally, Thomas testified that Alleyton's safety rules should not be selectively enforced. Thomas expressed her view that an employer should never use a pretextual reason to fire an employee.

Thomas testified that documentation is important so "that you have a record to go by" in all disciplinary actions, including terminations. Thomas agreed that without documentation, there is "really no evidence that [the disciplinary action] occurred." Thomas further agreed that the purpose of the communication and

documentation rules was that they were "a way of confirming that everyone is acting honestly."

Perry agreed that employees like Ball deserved honest communication about reasons for discipline or termination. Perry testified that an employer should never hide its reasons for terminating an employee, and it should never change its reasons for termination after the fact.

Gardner also agreed that there was no legitimate business reason for an employer to hide a termination for job performance issues causing safety problems. Gardner was asked whether "progressive discipline, giving verbal warnings, written warnings things like that, would have been appropriate in Mr. Ball's case?" Gardner replied that it "[m]ay have helped." But, in the ten months Ball worked after he was released back to full duty, he was never disciplined, and no performance issues were documented.

Alleyton, on its "Employee Separation Form," checked the box "Discharge–Job Performance," under the column "Involuntary Separation." There is a blank where comments could be added explaining the "final incident," but that space was left empty. There was also an instruction to "attach documentation if necessary," but no documents were attached. Anderson testified that the Employee Separation Form correctly identified the basis for Ball's termination. But, conversely, Bowman testified that Alleyton "did not terminate him for performance reasons." Bowman continued that job performance was not the reason Ball was terminated because "Mr. Ball did his job well."

Most of the testimony criticizing Ball's work performance concerned the slow pace at which he worked. On appeal, Alleyton cites safety as a reason for Ball's termination. Perry and Bowman did criticize Ball's handling of the chute in one of Perry's videos, but that is the only specific safety problem identified by any

Alleyton witness. Anderson, the person who actually fired Ball, testified that Ball was not terminated for safety reasons. When asked if anyone at Alleyton told Ball he had been terminated for safety reasons, Anderson specifically testified that Ball was not "terminated based on safety reasons." Anderson then agreed that was "not an honest claim that the jury should even consider."

After he was fired, Ball applied for numerous jobs. In addition, he talked to numerous people about jobs, started a Career Builder account, and a Monster account. Ball admitted that it was "tough to find a job as a mid-forties guy looking for work." After searching for nearly a year, Ball found two part-time jobs as a bus driver. Ball testified that he is now making half or less of the income that he made while working for Alleyton.

Ball filed suit alleging Alleyton violated section 451.001 of the Texas Labor Code when it terminated his employment. *See* Tex. Lab. Code Ann. § 451.001 (prohibiting an employer from discharging or otherwise discriminating against an employee because that employee filed a workers' compensation claim in good faith or instituted or caused to be instituted in good faith a proceeding under the statute). The case went to trial before a jury and the jury returned a verdict in Ball's favor. The trial court then signed a judgment in favor of Ball. The judgment ordered that Ball recover from Alleyton (1) $956,187.00 in actual damages, (2) $750,000 exemplary damages, (3) prejudgment and post-judgment interest, and (4) taxable costs of court. Alleyton filed a Motion for Judgment Notwithstanding the Verdict, for New Trial, or for Remittitur, which the trial court denied by written order. This appeal followed.

## ANALYSIS

I.      **Sufficient evidence supports the jury's finding that Alleyton violated section 451.001 of the Texas Labor Code.**

11

Alleyton argues in its first issue that the admissible evidence is factually insufficient to support the jury's finding that Alleyton terminated Ball because he had instituted a proceeding under the Texas workers' compensation statute.[2] In its second issue, Alleyton asserts that the trial court abused its discretion when it admitted Plaintiff's Exhibit 4, the claims diary, into evidence over a hearsay objection. Because these issues are related, we address them together.

## A. Standard of review

In reviewing the factual sufficiency of the evidence, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When a party challenges the factual sufficiency of the evidence supporting a finding for which it did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Barnhart v. Morales*, 459 S.W.3d 733, 745 (Tex. App.—Houston [14th Dist.] 2015, no pet.). When a party attacks the factual sufficiency of an adverse finding on which it had the burden of proof, it must demonstrate on appeal that the

---

[2] Alleyton's first issue generally asserts that insufficient evidence supports the jury's finding that it terminated Ball in violation of section 451.001 of the Texas Labor Code. It then went on to specifically argue that, while Ball did introduce evidence supporting the jury's verdict, the evidence was "thin." It went on to assert that "the great weight of the evidence demonstrated that Alleyton terminated Ball's employment for a legitimate business reason: he could no longer safely perform his duties." Based on Alleyton's stated standard of review, arguments, and requested relief, we conclude Alleyton's first issue is limited to a factual sufficiency challenge and address it accordingly. Even if Alleyton's first issue could be construed as a legal sufficiency challenge, based on the evidence we have summarized above, and Alleyton's own concession that there is evidence in the record supporting the verdict, we conclude that the evidence is legally sufficient. *See Univ. Gen. Hosp., L.P. v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 550 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (stating that when an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate on appeal that there is no evidence to support the adverse finding).

adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *Id.* This Court is not a factfinder. *Id.* (citing *Ellis*, 971 S.W.2d at 407). Instead, the jury is the sole judge of the credibility of the witnesses and the weight to afford their testimony. *Id.* When presented with conflicting evidence, a jury may believe one witness and disbelieve others, and it also may resolve inconsistencies in the testimony of any witness. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *Eurecat U.S., Inc. v. Marklund*, 527 S.W.3d 367, 383 (Tex. App.—Houston [14th Dist.] 2017, no pet.). We may not, therefore, pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would also support a different result. *Eurecat U.S., Inc.*, 527 S.W.3d at 383. If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming. *Id.* at 383–84.

When hearsay is admitted over an appropriate objection it has no probative value and should not be considered when evaluating the sufficiency of the evidence. *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 242 (Tex. App.—Corpus Christi 1994, writ denied). We therefore must first resolve Alleyton's second issue challenging the trial court's admission of Plaintiff's Exhibit 4, the claims diary, into evidence. The decision to admit or exclude evidence lies within the sound discretion of the trial court. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). A trial court exceeds its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *Barnhart*, 459 S.W.3d at 742 (citing *Bowie Mem'l Hosp. v. Wright*, 79

13

S.W.3d 48, 52 (Tex. 2002)). When reviewing matters committed to the trial court's discretion, a reviewing court may not substitute its own judgment for that of the trial court. *Id.* Thus, the question is not whether this court would have admitted the evidence. Rather, an appellate court will uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling, even if that ground was not raised in the trial court. *Id.* Therefore, we examine all bases for the trial court's decision that are suggested by the record or urged by the parties. *Id.*

A party seeking to reverse a judgment based on evidentiary error must prove that the error probably resulted in rendition of an improper judgment, which usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Id.* To determine whether evidentiary error probably resulted in the rendition of an improper judgment, an appellate court reviews the entire record. *Id.* (citing *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001)).

### B. The trial court did not abuse its discretion when it admitted Plaintiff's Exhibit 4.

Alleyton argues in its second issue that the trial court abused its discretion when it admitted Plaintiff's Exhibit 4, the claims diary, because the document was hearsay and Ball did not establish that the exhibit was drafted by Alleyton's agent. *See* Tex. R. Evid. 801(e)(2)(D) (providing that a statement is not hearsay if it is offered against a party and it was drafted by an agent or employee of the party). We need not reach the question whether the insurance company adjustor who added notes into Plaintiff's Exhibit 4 was Alleyton's agent because we conclude that the exhibit was admissible pursuant to Rule 801(e)(2)(B), which provides that a statement is not hearsay if the statement is offered against a party and that party has manifested that it had adopted or believed the exhibit was true. *See* Tex. R.

14

Evid. 801(e)(2)(B); *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 856 (Tex. 2011) (stating rule that "where a party has used a document made by a third party in such a way as amounts to an approval of its contents, such statement may be received against him as an admission by adoption") (internal quotation omitted).

The claims diary, Plaintiff's Exhibit 4, was produced during discovery by Alleyton. The claims diary identifies Gardner as the "Create User." Thomas testified that part of her job as Alleyton's safety administrator was to review and maintain the workers' compensation files. She further testified that it was her "pattern and practice to make sure that the claims diary was accurate" as best she could. Thomas trusted the adjustors she worked with and trusted them to be accurate in the notes they entered into the claims diary. In addition, Thomas testified that she would have reported any inaccuracies that she found in the claims diary to the adjustor. According to Thomas, Alleyton kept the claims diary as part of its own records regarding employee workers' compensation claims and she relied on them to report the status of those claims, including Ball's claim, to Alleyton's upper management, including Gardner. We conclude that Plaintiff's Exhibit 4 fits within Rule 801(e)(2)(B) and is therefore not hearsay. *See Hernandez v. Zapata*, No. 04-19-00507-CV, 2020 WL 3815932, at *6 (Tex. App.—San Antonio July 8, 2020, no pet.) (mem. op.) (concluding that because party produced bank statements and by adopting the bank statements as his own, party manifested an adoption or belief in their truth). We hold the trial court did not abuse its discretion when it admitted Plaintiff's Exhibit 4 into evidence over Alleyton's hearsay objection. *See id.* ("Therefore, the bank statements are not hearsay and were admissible as statements by a party opponent."). We overrule Alleyton's second issue.

15

**C.** **Factually sufficient evidence supports the jury's finding that Alleyton terminated Ball's employment because he had instituted a proceeding under the workers' compensation statue.**

In its first issue Alleyton argues that the admissible evidence is factually insufficient to support the jury's finding that it terminated Ball's employment in retaliation for instituting a proceeding under the workers' compensation statute. Alleyton's sufficiency argument is based, in part, on its contention that Plaintiff's Exhibit 4, the claims diary, was inadmissible hearsay. We have already rejected Alleyton's hearsay argument. In addition, when making its sufficiency challenge, Alleyton focuses exclusively on evidence contrary to the jury's verdict and ignores the evidence supporting the verdict. This, however, is not the standard of review we are required to follow. While we do examine all of the evidence in the record, we are not permitted to reweigh the evidence, pass upon the credibility of the witnesses, or substitute our judgment for that of the jury. This is true even if the evidence could support a different result. *Thomas v. Uzoka*, 290 S.W.3d 437, 452 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). With this preface, we turn to Alleyton's sufficiency challenge.

The Labor Code provides, in pertinent part, that a person may not discharge or discriminate against an employee because the employee has: (1) filed a workers' compensation claim in good faith; (2) hired a lawyer to represent the employee in a claim; or (3) instituted or caused to be instituted in good faith a workers' compensation proceeding. Tex. Lab. Code Ann. § 451.001. "An employer who violates this statute is subject to a retaliation claim, which constitutes an exception to the traditional doctrine of employment at will found in Texas law." *Kingsaire, Inc. v. Melendez*, 477 S.W.3d 309, 312 (Tex. 2015) (internal quotation marks omitted). To prove a retaliatory discharge claim, the employee must show that the employer's action would not have occurred when it did had the employee's

protected conduct, such as instituting in good faith a workers' compensation proceeding, not occurred. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005).

Alleyton argues the evidence is insufficient because Ball introduced no direct evidence that Alleyton retaliated against him in violation of section 451.001 of the Labor Code. Ball was not, however, required to prove his claim only through direct evidence. *See Kingsaire, Inc.*, 477 S.W.3d at 312; *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 451 (Tex. 1996) ("Circumstantial evidence, and the reasonable inferences from such evidence, can prove the causal connection."). Instead, Ball could prove his claim through circumstantial evidence. *Kingsaire, Inc.*, 477 S.W.3d at 312. Such circumstantial evidence may include, but is not limited to, an employer's expression of a negative attitude toward the employee's injury, an employer's discriminatory treatment of the employee compared with similarly situated employees, an employer's failure to adhere to established company policy, and evidence that the employer's stated reason for termination was false. *Id.* In addition, close timing between the employee's protected activity and the adverse employment action is also relevant circumstantial evidence of a causal link and a retaliatory motive. *Salas v. Fluor Daniel Servs. Corp.*, 616 S.W.3d 137, 146 (Tex. App.—Houston [14th Dist.] 2020, pet. filed).

Having reviewed the evidence, we conclude the evidence is factually sufficient to support the jury's finding. In arguing to the contrary, Alleyton ignores the evidence in the record supporting the jury's decision, addresses each category of circumstantial evidence independently, and then asks this court to reweigh the evidence and believe only their witnesses' testimony. This we cannot do. *Thomas*, 290 S.W.3d at 452.

Turning to the record evidence, we begin with the claims diary. The claims diary establishes that, at least by September 20, 2016, Alleyton's workers' compensation carrier had notified Alleyton, through Thomas, that Ball was disputing the determination that he was at maximum medical improvement and ready to return to work without restrictions, and that he would request a BRC if an agreement had not been worked out by September 16, 2016. Thomas testified that she kept Alleyton's upper management, including Gardner, informed of what was happening with regard to all workers' compensation claims. The claims diary also shows there was extensive discussion on October 14, 2016, the same day that Ball was terminated, regarding the status of Ball's workers' compensation claim, Ball's notice to the workers' compensation carrier that he intended to file a BRC, and Alleyton's desire to have Ball's claim file transferred to Alleyton's local attorney. Based on this evidence, the jury could have reasonably found that Alleyton was aware, when it terminated Ball, that Ball planned to institute a proceeding under the workers' compensation statute. *See Glass v. Amber, Inc.*, No. 01-00-00589-CV, 2002 WL 31430097, at *4 (Tex. App.—Houston [1st Dist.] Oct. 31, 2002, pet. denied) ("Wrongful discharge is a viable cause of action when an employee is fired once he or she had begun taking steps towards instituting a proceeding for collecting workers' compensation benefits."). The jury could have also reasonably determined, based on the claims diary and Thomas's testimony, that Gardner, Anderson, and Bowman knew this information before they made the decision to terminate Ball. *See id.* (stating jury could have disbelieved employer's witnesses and instead believed employer knew about employee's workers' compensation claim before firing him). Finally, the jury, based on this evidence, could have reasonably concluded that termination occurred in close temporal proximity to Ball's decision to request a BRC. *See Salas*, 616 S.W.3d at 146.

18

Other evidence in the record establishes that Alleyton expressed a negative attitude toward Ball and treated Ball differently than other employees. This evidence includes Ball's testimony that Alleyton's drivers routinely helped each other perform their tasks. According to Ball, the other drivers helped him, because he had helped them in the past. According to Ball, Alleyton had encouraged an "A-team" policy of being a team and encouraging workers to help each other out. But, Perry testified that the same day he videoed Ball working, Perry singled Ball out and prohibited the other drivers from helping him. Perry testified that he "told everyone they needed to go on back and perform their own job and not to help him because he was released to work, so he needed to take care [of] his own job." Perry, did not testify that Alleyton changed their overall policy of encouraging other workers to help each other out. The jury could also have reasonably concluded that Perry and Gardner demonstrated a negative attitude toward Ball when Perry videoed Ball performing his job, and Gardner went to the job site and watched Perry "up and down" while Perry hosed off his truck.

The jury also heard extensive testimony the jury could have reasonably found demonstrated that Alleyton failed to adhere to its policies when it terminated Ball. *See Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 617 (Tex. 2004) (evidence that employer did not follow its policies supported the jury's finding of a section 451.001 violation). Several Alleyton witnesses testified that Ball was a good worker. They also testified that Alleyton's policies called for a progressive approach to disciplining employees with each step of the process documented and communicated to the employee. The witnesses also testified that these procedures applied to all disciplinary issues whether they related to safety or job performance problems. The evidence is undisputed that Ball was not "written-up" for any safety or performance issues before or after his on-the-job injury. Yet, when asked

about the reason Ball was terminated, Alleyton's witnesses testified he was terminated because he could not safely perform his job.

The jury could also have reasonably determined that Alleyton's stated reason for terminating Ball was false. See *Cont'l Coffee Prods. Co.*, 937 S.W.2d at 451 (stating that circumstantial evidence that the purported reason for firing employee was false can establish causal link). The jury viewed Perry's videos of Ball working and they could have decided that he was performing his work safely, if slowly. In conjunction with this evidence, the jury heard Anderson testify that Ball was not terminated because he worked slowly. The jury could have credited this evidence and believed that Ball's slowness was not the true reason he was fired, but believed it was the economic cost associated with Ball's slowness that motivated Alleyton's decision in part. It could also have found, based on Bowman's and Gardner's testimony that the accumulating costs associated with Ball's workers' compensation claim, which would now include the cost of an attorney, was a motivating factor in the decision to terminate. Finally, the jury heard the differing versions of how the decision to terminate Ball was reached that were told by Alleyton's own witnesses, which are detailed above, and it also heard Ball's recording of the termination meeting. The jury could have reasonably discredited the Alleyton's witnesses' testimony explaining that Ball was terminated because he could not safely perform his job and instead believed Ball was terminated because of his ongoing workers' compensation "issue" as Anderson intimated at the beginning of the recorded termination meeting.

While there was conflicting evidence in the record on the reason Alleyton terminated Ball, the jury was entitled to believe the testimony of one witness and not that of another. *Barnhart*, 459 S.W.3d at 747. It was also empowered to resolve any inconsistencies in the evidence, including inconsistencies within any

20

witness's testimony. *Id.* The fact that the jury resolved any conflicts or inconsistencies in the evidence against Alleyton does not make the evidence factually insufficient. *Id.* We conclude that the jury's finding that Alleyton terminated Ball because he had instituted a proceeding under the workers' compensation act is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule Alleyton's first issue.

## II. Sufficient evidence supports the jury's implied rejection of Alleyton's mitigation of damages affirmative defense.

Question Number 2 of the charge asked the jury to determine Ball's damages. The question included an instruction that the jury should not include in its "answer any amount that you find Joseph Ball could have earned by exercising reasonable diligence in seeking other employment." The jury then found that Ball had sustained $164,168.00 in past lost wages and, in reasonable probability, would sustain $675,519.00 in future lost wages. Alleyton argues in its third issue that the evidence is legally and factually insufficient to support the jury's answers because Ball failed to mitigate his damages. We disagree.

### A. Standard of review and applicable law

A wrongfully discharged employee has a duty to mitigate damages. *Am. West Airlines, Inc. v. Tope*, 935 S.W.2d 908, 915 (Tex. App.—El Paso 1996, writ dism'd). The doctrine of mitigation of damages prevents a party from recovering for damages that could be avoided by reasonable efforts on the part of the plaintiff. *Great Am. Ins. Co. v. North Austin Mun. Util. Dist.*, 908 S.W.2d 415, 426 (Tex. 1995). Reasonable efforts are those that a party can avoid at a trifling expense or with reasonable exertions. *Id.* The party asserting the affirmative defense has the burden of proving that damages could have been mitigated. *See Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 135 (Tex. App.—Houston [14th

Dist.] 2000, no pet.).   Here, Alleyton, as the party raising mitigation of damages as an affirmative defense, bore the burden to prove lack of diligence by Ball and the amount by which the damages were increased because of Ball's alleged failure to mitigate.  *Kartsotis v. Bloch*, 503 S.W.3d 506, 522 (Tex. App.—Dallas 2016, pet. denied).  "Generally, the reasonableness of plaintiff's explanation for rejecting a job offer, and the adequacy of efforts to mitigate, are fact questions properly left to the jury."  *Am. West Airlines, Inc.*, 935 S.W.2d at 915.

A party attacking the legal sufficiency of the evidence supporting an adverse finding on an issue on which it had the burden of proof must demonstrate that the evidence conclusively establishes all vital facts in support of the issue.  *Dow Chem. Co.*, 46 S.W.3d at 241.  In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that supports it.  *Univ. Gen. Hosp., L.P.*, 403 S.W.3d at 550. The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review.  *Id.* at 551.  We must credit favorable evidence if a reasonable trier of fact could, and disregard contrary evidence unless a reasonable trier of fact could not.  *Id.*  The trier of fact is the sole judge of the witnesses' credibility and the weight to afford their testimony.  *Id.*

We review the factual sufficiency of the evidence according to the standard of review set forth above in section I(A).

### B.     Legally and factually sufficient evidence supports the jury's determination that Ball mitigated his damages.

In making its mitigation argument Alleyton places much emphasis on (1) Ball's testimony that he could not recall applying for another ready-mix driver job; (2) evidence from its own witnesses that Ball, as a trained ready-mix driver, could have quickly obtained a comparable job with another ready-mix company; and (3)

Ball turned down a dispatcher position allegedly offered by Alleyton two months after Alleyton fired him. Because Alleyton ignores the evidence supporting the jury's damages determination, and the evidence demonstrating Ball's efforts to obtain employment after he was fired, we disagree.

While Ball may not have applied for ready-mix driver jobs, the jury could have reasonably believed his explanation for why he did not apply for or accept a driver position at another ready-mix company was reasonable. Ball testified, and Alleyton witnesses agreed, that Alleyton offered its drivers a guaranteed forty-hour paid work week, even when the weather prevented work. Ball testified that he investigated other ready-mix companies and his efforts revealed none offering a comparable pay guarantee. Ball testified that he did not believe it was in his family's best economic interest to accept one of those jobs where he might end up working only a few hours a week. While Bowman testified Alleyton's competitors did offer a guaranteed paid work week, the jury could have disbelieved his testimony and instead believed Ball's. In addition, Alleyton has not cited any legal authority requiring that a fired employee, in order to mitigate his damages, must apply for the exact same type of job. Instead, to mitigate damages, a fired employee must make a reasonable effort to seek substantially similar employment. *Hertz Equip. Rental Corp. v. Barousse*, 365 A.W.3d 46, 58 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). The jury could have reasonably found that Ball, who accepted two commercial driver jobs, did so after he was fired.

We turn next to Alleyton's assertion that Ball alleged rejection of a dispatcher position at Alleyton establishes he failed to mitigate his damages. It is undisputed that Ball received a text message from an Alleyton phone number stating: "How you doing? Well, I hope. Hey, they got dispatching position open. I don't know if you want to give it a shot or not." Ball testified that he did not

know who at Alleyton, the company that had recently fired him, sent the text message. So, Ball, seeking more information, texted back "What's up? Who is this?" Ball explained that he believed the text might be a prank or have been sent in error, and he wanted clarification. Ball testified no one from Alleyton ever responded to his questions. Ball further testified he was suspicious because this same company had fired him for no reason and without offering a different job. Alleyton argues Ball's response to that text message was inadequate. In Alleyton's view, Ball's response equates to rejecting a dispatcher job offer. We disagree this is the only view the jury could have taken of this interaction. We conclude the jury could have reasonably found that Ball made a reasonable effort in response to the Alleyton text message. *Am. West Airlines, Inc.*, 935 S.W.2d at 915; *Azar Nut Co. v. Caille*, 720 S.W.2d 685, 688 (Tex. App.—El Paso 1986), *aff'd* 734 S.W.2d 667 (Tex. 1987) ("There was evidence in the record concerning the sincerity of the job offer, and it was properly up to the jury to resolve whether or not the Appellee had a reasonable explanation for rejecting the job offer.").

Finally, Alleyton minimizes the evidence demonstrating that Ball applied for numerous jobs after he was fired and eventually accepted two part-time driving jobs making half or less of his pay at Alleyton. The jury could have reasonably found that these efforts by Ball to find other employment were sufficient to mitigate his damages. *Am. West Airlines, Inc.*, 935 S.W.2d at 915.

We conclude the evidence is legally and factually sufficient to support the jury's implied rejection of Alleyton's mitigation of damages affirmative defense. We overrule Alleyton's third issue.

## III. Sufficient evidence supports the jury's exemplary damages award.

Alleyton asserts in its fourth issue that Ball failed to offer legally sufficient

proof that Alleyton acted with malice when it terminated Ball.[3]  Ball responds that under the charge that was submitted to the jury without objection, sufficient evidence supports the exemplary damages awarded by the jury.  We agree with Ball.

Here, Question No. 3 of the charge asked the jury: "Do you find, by clear and convincing evidence that the harm, if any, to Joseph Ball resulted from the malice or gross negligence of Alleyton Resource Company?"  Question No. 4 asked the jury "What sum of money, if any, should be assessed against Alleyton Resource Company and awarded to Joseph Ball as exemplary damages, if any, for the conduct found in response to Question 1 and 3?"  Alleyton did not object to either question.  We therefore measure the sufficiency of the evidence against the charge actually given to the jury.  *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).  Alleyton does recognize this rule when, in a footnote, it states that the charge did instruct the jury that gross negligence could support exemplary damages.  It then ignores the fact that the jury could have based its exemplary damages award on a finding that Alleyton was grossly negligent when it fired Ball in retaliation for initiating in good faith a workers' compensation proceeding.  We therefore may affirm the jury's exemplary damages award if there is sufficient evidence that Alleyton was grossly negligent when it terminated Ball regardless of whether sufficient evidence supports a malice finding.  *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001) (in a tortious interference with contract case stating that legal sufficiency analysis must be made "in light of the jury

---

[3] Alleyton specifically argued in its brief that "Ball failed to offer any evidence that Alleyton intended to cause or disregarded an injury distinct from his termination."  Alleyton continued that same argument later in its brief when it asserted that "Ball did not submit any evidence of an independent harm."  Finally, Alleyton concluded this issue by stating that "the trial record does not support an award of exemplary damages."  We construe this as a challenge to the legal sufficiency of the evidence supporting the jury's exemplary damages award.  Alleyton makes no challenge to the actual amount of exemplary damages awarded by the jury.

25

charge that the district court gave without objection"); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000) (stating that when no objection was made to jury instruction, evidence to support a finding based on the instruction should be assessed "in light of" the instruction given).

> Question No. 3 instructed the jury that
>
> "Gross negligence" means an act or omission by Alleyton Resource Company,
>
> > 1.    which when viewed objectively from the standpoint of Alleyton Resource Company at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
> >
> > 2    of which Alleyton Resource Company has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

In addition, the jury was instructed that, in order to find Alleyton was grossly negligent, it must find that Alleyton was acting through a person employed by Alleyton as a vice principal who was acting in the course and scope of employment.  Finally, the jury was instructed that a vice principal includes a corporate officer, a person who has the authority to employ, direct, and discharge an Alleyton employee, or a person charged with the management of a department or division of Alleyton's business.

Therefore, under the charge given to the jury and our standard of review, the evidence is legally sufficient to support exemplary damages if, when considering the entire record, evidence exists that is capable of producing a firm belief or conviction that Alleyton acted with gross negligence when it retaliated against Ball because he exercised his right to institute in good faith a proceeding under the Workers' Compensation Act. *See Ancira Enterprises, Inc. v. Fisc*her, 178 S.W.3d 82, 93–94 (Tex. App.—Austin 2005, no pet.) (examining sufficiency of the

evidence supporting exemplary damages awarded in an employment discrimination retaliation case).

There is no dispute that the Alleyton employees involved in the decision to terminate Ball—Anderson, Gardner, and Bowman—qualify as vice principals as defined in the jury charge. These witnesses, along with Thomas, who reported directly to Gardner, testified to an awareness that terminating an employee in retaliation for instituting in good faith a proceeding under the Workers' Compensation Act was not only against Alleyton's policies, but also violated the law. We conclude this evidence would enable a reasonable juror to infer a firm belief or conviction that Alleyton was subjectively aware that retaliating against Ball for instituting a workers' compensation proceeding would violate his legal rights, yet it proceeded with conscious indifference to that risk, and that retaliating against Ball objectively involved an extreme degree of risk of violating Ball's legal rights. *Id.* at 95. We conclude the evidence supporting the exemplary damages award is legally sufficient and overrule Alleyton's fourth issue.

## IV. The trial court did not abuse its discretion when it refused to include Alleyton's requested at-will employment instruction in the jury charge.

In its fifth issue Alleyton argues that the trial court abused its discretion when it refused to submit its requested at-will employment instruction in the jury charge. Alleyton's requested instruction provided:

> You are instructed that, when an employee is hired for an indefinite period of time, the employment relationship may be terminated at will by either party. Under this "at will" rule, the employer may, without liability, discharge the employee for a good reason, a bad reason, or no reason at all. You are further instructed that "Joseph Ball" was an employee at will and that "his employer" could discharge him at any time for any reason, so long as that reason did not violate any law.

Alleyton asserts the trial court abused its discretion because the proposed

27

instruction accurately states the law, was supported by the evidence and pleadings, and, in Alleyton's view, was reasonably necessary for the jury to render a proper verdict.

A trial court must submit in its charge to the jury all questions, instructions, and definitions that are raised by the pleadings and the evidence. *See* Tex. R. Civ. P. 278; *E.I. DuPont de Nemours & Co v. Roye*, 447 S.W.3d 48, 56 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd) (citing *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663–64 (Tex. 1999)). The parties have the right to be judged by a jury properly instructed in the law. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000). The goal, therefore, is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. *Roye*, 447 S.W.3d at 56. To achieve this goal, trial courts enjoy broad discretion so long as the charge is legally correct. *Id.* Determining what jury instructions are necessary and proper is within the trial court's discretion. *Shupe v. Lingafelter*, 192 S.W3d 577, 579 (Tex. 2006). When submitting the jury charge, a trial court is afforded more discretion when submitting instructions than when submitting questions. *Bexar Cnty. Appraisal Dist. v. Abdo*, 399 S.W.3d 248, 257 (Tex. App.—San Antonio 2012, no pet.). When a trial court refuses to submit a requested instruction or definition, the issue on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Eurecat US, Inc.*, 527 S.W.3d at 380. We review that decision for an abuse of discretion. *Shupe*, 192 S.W.3d at 579.

Alleyton asked the court to include the proposed at-will employment instruction in the liability question submitting Ball's section 451.001 retaliation claim to the jury. The question at issue tracked the language of the statute when it asked whether Alleyton discriminated against or terminated Ball because he filed a

28

workers' compensation claim in good faith, or instituted, or caused to be instituted in good faith a proceeding under the Workers' Compensation Act. *See Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) (stating that when submitting statutory cause of action, charge should track language of the statute as closely as possible). The trial court also included in the question an instruction informing the jury that "an employer does not terminate or discriminate against an employee for filing a workers' compensation claim in good faith or instituting or causing to be instituted a workers' compensation claim in good faith, if the employer would have terminated the employee when it did even if the employee had not filed workers' compensation claim in good faith or instituting or causing to be instituted a workers' compensation claim in good faith."

Liability under section 451.001 of the Workers' Compensation Act is an exception to the at-will employment doctrine. *Johnson v. Waxahachie Indep, Sch. Dist.*, 322 S.W.3d 396, 399 (Tex. App.—Houston [14th Dist.] 2010, no pet.). As a result, the trial court could have concluded that the jury question at issue already adequately addressed Alleyton's right to terminate an employee and might have confused the jury by injecting a definition of the at-will doctrine into a case based on a statutory exception to that very same doctrine. Similarly, the trial court could have reasonably concluded that the requested instruction misstated the law appliable to the facts of the case because the cause of action at issue was a statutory exception to the at-will doctrine. An instruction that misstates the law as applicable to the facts or misleads the jury is improper. *Halmos v. Bombardier Aerospace Corp.*, 314 S.W.3d 606, 617 (Tex. App.—Dallas 2010, no pet.). Accordingly, we conclude the trial court did not abuse its discretion when it refused Alleyton's proffered instruction. We overrule Alleyton's fifth issue.

29

## V.  Alleyton waived its sixth issue.

Alleyton alternatively argues in its sixth issue that the damages awarded to Ball, except for his past lost wages, are excessive.  Alleyton then cites Rule 46.3 of the Texas Rules of Appellate Procedure and a single case, which it asserts stands for the proposition that an appellate court may suggest a remittitur when there is some evidence of damages but not enough to support the full amount.  Alleyton's argument is contained in a single paragraph.  It offers no explanation as to why they are excessive based on the record evidence and any applicable legal authority. *See* Tex. R. App. P. 38.1 (stating that a brief must contain a clear and concise argument for the contentions made with appropriate citations to legal authority and to the record).  As such, Alleyton asks this court to search the appellate record for evidence supporting its contention.  But, it is an appellant's burden to discuss his assertions of error, and we have no duty–or even right–to perform an independent review of the record and applicable law to determine whether there is error. *Hernandez v. Hernandez*, 318 S.W.3d 464, 466 (Tex. App.—El Paso 2010, no pet.); *see San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that "parties asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law supports their contentions").  Therefore, even liberally construing Alleyton's sixth issue, we cannot conclude that it has adequately briefed this issue.  Because of this inadequate briefing, Alleyton has waived its sixth issue. *See* Tex. R. App. P. 38.1; *San Saba Energy, L.P.*, 171 S.W.3d at 338.

## CONCLUSION

Having overruled Alleyton's issues on appeal, we affirm the trial court's final judgment.

/s/    Jerry Zimmerer
Justice


Panel consists of Justices Bourliot, Zimmerer, and Spain (Spain, J. concurring without opinion).